IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARCELOR FRANCE and ARCELOR ATLANTIQUE ET LORRAINE, | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No. 06-307-SLR |
| v. | ) ) ) | |
| MITTAL STEEL USA INC., | ) ) | |
| Defendant. | ) | |

## DECLARATION OF PHILIP A. ROVNER IN SUPPORT OF MITTAL'S MOTION TO DISMISS THE COMPLAINT

OF COUNSEL:

Joseph W. Berenato, III
Berenato, White & Stavish, LLC
6550 Rock Spring Drive, Ste. 240
Bethesda, Maryland 20817
(301) 896-0600

Kenneth B. Herman
Ropes & Gray
1251 Avenue of the Americas
New York, New York 10020-1105
(212) 596-9020

Dated: June 14, 2006

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
E-mail: provner@potteranderson.com

Attorneys for Defendant
Mittal Steel USA Inc.

I, Philip A. Rovner, declare:

1.    I am a member of the firm of Potter Anderson & Corroon LLP, counsel for defendant Mittal Steel USA Inc. ("Mittal") in the above-captioned case.

2.    I submit this declaration in support of Mittal's Reply Brief in Support of Motion to Dismiss the Complaint.

3.    Attached hereto as Exhibit 1 is a true and correct copy of HQ 089538, an August 7, 1991 Decision from the United States Bureau of Customs and Border Protection.

4.    Attached hereto as Exhibit 2 is a true and correct copy of NY H84171, an August 10, 2001 Decision from the United States Bureau of Customs and Border Protection.

5.    Attached hereto as Exhibit 3 is a true and correct copy of *Stainless Steel Sheet and Strip in Coils from Taiwan*, 70 Fed. Reg. 46,137, 46,143 (Aug. 9, 2005), U.S. Dep't. of Commerce Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review.

6.    Attached hereto as Exhibit 4 is a true and correct copy of *Stainless Steel Plate in Coils From Belgium*, Case No. A-423-808 (U.S. Dep't. of Commerce Antidumping Duty Administrative Review for period May 1, 2002 through April 30, 2003).

7.    Attached hereto as Exhibit 5 is a true and correct copy of Brief of Appellants filed October 31, 2005 in *Ugine and Alz Belgium, Arcelor Stainless USA, LLC, and Arcelor Trading USA, LLC v. United States*, CAFC No. 051550.

Dated:  June 14, 2006
736670

_____
Philip A. Rovner

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on June 14, 2006, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY

Jack B. Blumenfeld, Esq.
Karen Jacobs Louden, Esq.
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899
jblumenfeld@mnat.com
klouden@mnat.com

Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

# EXHIBIT 1

HQ 089538 August 7, 1991
CLA-2 CO:R:C:M 089538 DWS
CATEGORY: Classification
TARIFF NO.: 7219.32.00 - 7219.35.00
Mr. Ike Yang Sammi AL Tech, Inc.

13942 Orange Avenue Paramount, CA 90723
RE: Classification and Country of Origin of cold-rolled stainless steel coil
Dear Mr. Yang:

This is in response to your letter of April 29, 1991, concerning the classification and country of origin of certain cold-rolled stainless steel coil under the Harmonized Tariff Schedule of the United States Annotated (HTSUSA).

FACTS:

Type 304 hot-rolled stainless steel coils, manufactured in Canada, are sent to Korea where they are processed into cold-rolled steel coils. The cold-rolled steel coils will then be imported into the United States. Cold-rolled steel is different from hot-rolled steel in that its production is carried out below recrystallization temperatures, whereas hot-rolling is produced in temperatures above recrystallization. The cold reduction process significantly reduces the thickness of the hot-rolled product and results in a cold-rolled steel possessing greater tensile strength. In fact, the importer claims that there is a 50 to 60 percent reduction in thickness due to the cold reduction process. At the end of this process, a No. 2B unpolished finish will be applied, which is a bright cold-rolled finish produced by cold-rolling, annealing, and descaling followed by a final, light cold-rolled pass.

The importer claims that the cost of the hot-rolled stainless steel coil manufactured in Canada will be more than 60 percent of the value of the processed cold-rolled stainless steel coil. The cold-rolled stainless steel coils which will be imported into the United States measure from 0.4 mm to 3.5 mm in thickness and 48 inches in width.

ISSUE:

What is the classification and country of origin of the cold-rolled stainless steel coil?
LAW AND ANALYSIS:

COUNTRY OF ORIGIN
"Country of origin" is defined in 19 CFR 134.1(b) as "the country of manufacture, production, or growth of any article of foreign origin entering the United States. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the 'country of origin' within the meaning of this part."
"The essence . . . is that a product cannot be said to originate in the country of exportation if it is not manufactured there. The question, therefore, is whether operations performed on products in the country of exportation are of such a substantial nature to justify the conclusion that the resulting product is a manufacture of that country. 'Manufacture' implies a change, but every change is not manufacture . . . There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use'." Ferrostaal Metals Corp.

v. United States, 11 CIT 470, 473 (1987).

In **HQ 080277**, dated September 21, 1987, it was determined that cold reduction in one country, of hot-rolled steel coil from a different country, engenders a substantial transformation, and the steel becomes a product of the country in which the cold-rolling is accomplished.

It is our opinion that the cold-rolled stainless steel coil in question meets the substantial transformation test, in that it has a name, character, and use different from that possessed by the hot-rolled stainless steel coil as it is originally entered Korea. In this case, the transformation to cold-rolled steel has not been of a minor nature. As stated by the importer, the thickness of the hot-rolled steel coil is reduced from 50 to 60 percent during the cold reduction process.

Therefore, because the product in question underwent a substantial transformation in Korea, that country is the country of origin for tariff classification purposes.

CLASSIFICATION
Classification of merchandise under the HTSUSA is in accordance with the General Rules of Interpretation (GRI's), taken in order. GRI 1 provides that classification is determined according to the terms of the headings and any relative section or chapter notes.

The cold-rolled stainless steel coil is described in subheadings 7219.32.00 to 7219.35.00, HTSUSA. Pursuant to GRI 1, it will be classifiable under one of these provisions depending on thickness

To understand the language of heading 7219, HTSUSA, the Explanatory Notes may be utilized. The Explanatory Notes, although not dispositive, are to be used to determine the proper interpretation of the HTSUSA. 54 Fed. Reg. 35127, 35128 (August 23, 1989). Explanatory Note IV(C) to chapter 72 provides that further finishing to the product (i.e. annealing) does not affect the heading to which the steel is classified. At the end of the cold reduction process, an unpolished finish is applied to the steel through cold-rolling, annealing, and descaling, which does not, according to the Explanatory Notes, affect the classification of the cold-rolled steel.

HOLDING:

The country of origin for the cold-rolled stainless steel coil is Korea. It is classifiable under subheadings 7219.32.00 to 7219.35.00, HTSUSA, which provide for flat-rolled products of stainless steel, of a width of 600 mm or more: not further worked than cold-rolled:

7219.32.00- of a thickness of 3 mm or more but less than 4.75 mm;
7219.33.00- of a thickness exceeding 1 mm but less than 3 mm;
7219.34.00- of a thickness of 0.5 mm or more but not exceeding 1 mm;
7219.35.00- of a thickness of less than 0.5 mm.

The general, column one rate of duty is 10.1 percent ad valorem.

Regarding the applicability of Voluntary Restraint Arrangement (VRA) certification requirements, as this program is administered by the U.S. Department of Commerce, we recommend that you contact the Office of Agreements and Compliance, International Trade Administration, U.S. Department of Commerce, Washington, D.C., 20230 (telephone: 202-377-3793), for the VRA requirements applicable to the imported product.

Sincerely,
John Durant, Director Commercial Rulings Division

# EXHIBIT 2

NY H84171
August 10, 2001
CLA-2-72:RR:NC:1:117 H84171
CATEGORY: Classification
TARIFF NO.: 7219.33.00; 7219.34.00; 7219.35.00; 7219.90.00; 7220.20.10; 7220.20.60;
7220.20.70; 7220.20.90; 7220.90.00
Mr. Brian Barnett Kanematsu USA, Inc.

5847 San Felipe, Suite 2121 Houston, Texas 77057
RE:    The tariff classification and country of origin of cold-rolled flat-rolled stainless steel produced
from hot-rolled stainless steel coils from various countries, including France, Spain, Japan, Korea,
Taiwan and South Africa.

Dear Mr. Barnett:

    In your letter dated July 23, 2001, you requested a tariff classification ruling. You also ask about
the country of origin of the product that is imported into the United States.
    The products to be imported are cold-rolled flat-rolled stainless steel products in coil and cut-to-
length form. These flat-rolled products range from 50 mm to 1219 mm in width and from 0.25 mm to
2.0 mm in thickness. Some of the products will have a No. 2B or No. 2D unpolished cold-rolled
finish and some will have a No. 3 or No. 4 polished finish.

    The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring 600
mm or more in width and measuring over 1 mm but less than 3 mm in thickness will be 7219.33.00,
Harmonized Tariff Schedule of the United States (HTS), which provides for flat-rolled products of
stainless steel, of a width of 600 mm or more, not further worked than cold-rolled (cold-reduced), of
a thickness exceeding 1 mm but less than 3 mm. The rate of duty will be 3 percent ad valorem.
    The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring 600
mm or more in width and measuring 0.5 mm or more but not over 1 mm in thickness will be
7219.34.00, HTS, which provides for flat-rolled products of stainless steel, of a width of 600 mm or
more, not further worked than cold-rolled (cold-reduced), of a thickness of 0.5 mm or more but not
exceeding 1 mm. The rate of duty will be 3 percent ad valorem.

    The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring 600
mm or more in width and measuring less than 0. 5 mm in thickness will be 7219.35.00, HTS, which
provides for flat-rolled products of stainless steel, of a width of 600 mm or more, not further worked
than cold-rolled (cold-reduced), of a thickness of less than 0.5 mm. The rate of duty will be 3 percent
ad valorem.

    The applicable subheading for the cold-rolled and polished flat-rolled stainless steel products
measuring 600 mm or more in width of any thickness will be 7219.90.00, HTS, which provides for
flat-rolled products of stainless steel, of a width of 600 mm or more, other. The rate of duty will be
1.8 percent ad valorem.
    The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring 300
mm or more but less than 600 mm in width will be 7220.20.10, HTS, which provides for flat-rolled
products of stainless steel, of a width of less than 600 mm, not further worked than cold-rolled (cold-
reduced), of a width of 300 mm or more. The rate of duty will be 3 percent ad valorem.

    The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring less
than 300 mm in width and over 1.25 mm in thickness will be 7220.20.60, HTS, which provides for

flat-rolled products of stainless steel, of a width of less than 600 mm, not further worked than cold-rolled (cold-reduced), of a width of less than 300 mm, of a thickness exceeding 1.25 mm. The rate of duty will be 3.5 percent ad valorem.

The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring less than 300 mm in width and measuring over 0.25 mm but not over 1.25 mm in thickness will be 7220.20.70, HTS, which provides for flat-rolled products of stainless steel, of a width of less than 600 mm, not further worked than cold-rolled (cold-reduced), of a width of less than 300 mm, of a thickness exceeding 0.25 mm but not exceeding 1.25 mm. The rate of duty will be 3.2 percent ad valorem.

The applicable subheading for the cold-rolled flat-rolled stainless steel products measuring less than 300 mm in width and 0.25 mm or less in thickness will be 7220.20.90, HTS, which provides for flat-rolled products of stainless steel, of a width of less than 600 mm, not further worked than cold-rolled (cold-reduced), of a width of less than 300 mm, of a thickness not exceeding 0.25 mm, other. The rate of duty will be 2.4 percent ad valorem.

The applicable subheading for the cold-rolled and polished flat-rolled stainless steel products measuring less than 600 mm in width of any thickness will be 7220.90.00, HTS, which provides for flat-rolled products of stainless steel, of a width of less than 600 mm, other. The rate of duty will be 1.7 percent ad valorem.

You ask whether the imported products which are cold-rolled in Indonesia from hot-rolled flat-rolled stainless steel produced in various other countries, including France, Spain, Japan, Korea, Taiwan and South Africa, have been substantially transformed in Indonesia. The hot-rolled steel coils undergo the following processing operations in Indonesia. They go through a 20Hi- Sendzimir mill where they are cold-rolled, reducing the thickness of the coil from approximately 3 to 4 mm down to 0.25 to 2 mm. The steel is then pickled to clean it and remove the scale, after which it is annealed or heat-treated to give it the necessary formability. The steel goes through a 2Hi skin pass mill for a final cold-rolling to obtain the appropriate surface finish. At this point, the steel has either a No. 2B or No. 2D unpolished cold-rolled finish. When required, the steel will be polished to a No. 3 or No. 4 polished finish. The steel will finally be slit to narrower widths or cut to sheets to meet specific customer requirements. You state that the cost of producing the hot-rolled coils is approximately $800/MT and the cost of processing the finished cold-rolled flat-rolled products is approximately $500-600/MT.

A substantial transformation occurs when, as a result of manufacturing processes, a new and different article emerges, having a distinctive name, character or use, which is different from that originally possessed by the article or material before being subjected to the manufacturing process.

The issue concerning the country of origin/substantial transformation of cold-rolled flat-rolled steel produced from hot-rolled coils has been previously addressed in Headquarters' rulings 080277 dated September 21, 1987 and 089538 dated August 7, 1991. It was held in both these rulings that the cold-rolling process alters the physical and mechanical properties of the steel, that hot-rolled and cold-rolled flat-rolled steel are commercially distinguishable and marketable to different groups and that the cold-rolling processing operations significantly increased the value/cost of the steel product. The cold-rolled flat-rolled steel was found to meet the substantial transformation test, that is, it has a name, character, and use different from that possessed by the hot-rolled flat-rolled steel. Both rulings held that the steel became a product of the country in which the cold-rolling occurred.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Paula Ilardi at 212-637-7016.

Sincerely,
Robert B. Swierupski                    Director,                    National Commodity                    Specialist Division

# EXHIBIT 3

Based on the EA, RUS has concluded that the proposed action will not have a significant effect to various resources, including important farmland, floodplains, wetlands, cultural resources, threatened and endangered species and their critical habitat, air and water quality, and noise.

RUS has also determined that there would be no negative impacts of the proposed project on minority communities and low-income communities as a result of the construction of the project.

Dated: July 21, 2005

James R. Newby,

*Assistant Administrator, Electric Program, Rural Utilities Service*

[FR Doc. 05–15675 Filed 8–8–05; 8:45 am]

BILLING CODE 3410–15–P

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–583–831]

### Stainless Steel Sheet and Strip in Coils from Taiwan: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review

AGENCY: Import Administration, International Trade Administration, Department of Commerce.

EFFECTIVE DATE: August 9, 2005.

SUMMARY: In response to a request from petitioners [1] and one Taiwanese manufacturer/exporter, Chia Far Industrial Factory Co., Ltd ("Chia Far"), the Department of Commerce ("the Department") is conducting an administrative review of the antidumping duty order on stainless steel sheet and strip in coils ("SSSS") from Taiwan. This review covers six producers/exporters of the subject merchandise. The period of review ("POR") is July 1, 2003, through June 30, 2004.

The Department has preliminarily determined that all but one of the companies subject to this review made U.S. sales at prices less than normal value ("NV"). If these preliminary results are adopted in our final results of administrative review, we will instruct U.S. Customs and Border Protection ("CBP") to assess antidumping duties on all appropriate entries. Interested parties are invited to comment on these preliminary results of review. We will issue the final results of

review no later than 120 days from the date of publication of this notice.

FOR FURTHER INFORMATION CONTACT: Melissa Blackledge (Chia Far) or Karine Gziryan (YUSCO); AD/CVD Operations Office 4, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, DC 20230; telephone (202) 482–3518 or (202) 482–4081, respectively.

SUPPLEMENTARY INFORMATION:

### Background

On July 1, 2004, the Department published a notice of opportunity to request an administrative review of the antidumping duty order on SSSS from Taiwan. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 69 FR 39903 (July 1, 2004). In response to this opportunity notice, on July 30, 2004, petitioners and one producer/exporter, Chia Far, requested that the Department conduct an administrative review covering the period July 1, 2003, through June 30, 2004. Based on these requests, the Department initiated an administrative review of the following sixteen companies: Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen"), Tung Mung Development Co. Ltd. ("Tung Mung"), China Steel Corporation ("China Steel"), Yieh Mau Corp. ("Yieh Mau"), Chain Chon Industrial Co., Ltd ("Chain Chon"), Goang Jau Shing Enterprise Co., Ltd. ("Goang Jau Shing"), PFP Taiwan Co., Ltd. ("PFP Taiwan"), Yieh Loong Enterprise Company, Ltd. ("Yieh Loong"), Tang Eng Iron Works Company, Ltd. ("Tang Eng"), Yieh Trading Corporation ("Yieh Trading"), Chien Shing Stainless Steel Company Ltd. ("Chien Shing"), Chia Far, Yieh United Steel Corporation ("YUSCO"), Emerdex Stainless Flat–Rolled Products, Inc., Emerdex Stainless Steel, Inc., and the Emerdex Group ("the Emerdex companies") *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 69 FR 52857 (August 30, 2004)

During September, October, and November, 2004, the Department issued its antidumping questionnaire to all of the companies for which a review was initiated except the Emerdex companies (for further discussion of the Emerdex companies, see the section of this notice entitled "Partial Final Rescission of Review," below). [2] Of the six companies

that responded to the questionnaire, only two, Chia Far and YUSCO, reported that they sold subject merchandise to the United States during the POR.

On November 10, 2004, we notified the following companies by letter that if they did not respond to the Department's requests for information by November 17, 2004, the Department may use adverse facts available ("AFA") in determining their dumping margins: Tang Eng, Goang Jau Shing, Chien Shing, PFP Taiwan, Yieh Mau, Yieh Trading, and Yieh Loong. In November 2004, Tang Eng, Yieh Mau, and Yieh Loong reported that they did not sell or ship subject merchandise to the United States during the POR.

Throughout this administrative review, the Department has issued supplemental questionnaires to Chia Far and YUSCO, and petitioners have submitted comments regarding the respondents' questionnaire responses. The petitioners have also submitted comments regarding Ta Chen and the Emerdex companies.

On March 9, 2005, the Department extended the deadline for issuing the preliminary results in this administrative review until August 1, 2005. *See Stainless Steel Sheet and Strip in Coils from Taiwan: Extension of Time Limits for Preliminary Results of Antidumping Duty Administrative Review,* 70 FR 11614 (March 9, 2005).

### Scope of the Order

The products covered by the order on SSSS from Taiwan are certain stainless steel sheet and strip in coils. Stainless steel is an alloy steel containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements. The subject sheet and strip is a flat–rolled product in coils that is greater than 9.5 mm in width and less than 4.75 mm in thickness, and that is annealed or otherwise heat treated and pickled or otherwise de–scaled. The subject sheet and strip may also be further processed (*e.g.*, cold–rolled, polished, aluminized, coated, etc.) provided that it maintains the specific dimensions of sheet and strip following such processing.

---

[1] The petitioners are Allegheny Ludlum, AK Steel Corporation. Butler Armco Independent Union. J&L Specialty Steel. Inc., United Steelworks of America. AFL-CIO/CLC. and Zanesville Armco Independent Organization.

[2] Section A of the questionnaire requests general information concerning a company's corporate

structure and business practices. the merchandise under review that it sells, and the manner in which it sells that merchandise in all of its markets. Section B requests a complete listing of all home market sales. or, if the home market is not viable, of sales in the most appropriate third-country market (this section is not applicable to respondents in non-market economy (NME) cases). Section C requests a complete listing of U.S. sales. Section D requests information on the cost of production (COP) of the foreign like product and the constructed value (CV) of the merchandise under review. Section E requests information on further manufacturing.

The merchandise subject to this order is currently classifiable in the HTSUS at subheadings: 7219 13 00.31, 7219 13 00 51, 7219 13 00 71, 7219 13 00 81, 7219 14 00 30, 7219 14 00 65, 7219 14 00 90, 7219 32 00.05, 7219 32 00 20, 7219 32 00 25, 7219 32 00 35, 7219 32 00 36, 7219 32 00.38, 7219 32 00.42, 7219 32 00 44, 7219 33 00 05, 7219 33 00 20, 7219 33 00 25, 7219 33 00 35, 7219 33 00 36, 7219 33 00 38, 7219 33 00.42, 7219 33 00 44, 7219 34 00.05, 7219 34 00 20, 7219 34 00 25, 7219 34 00 30, 7219 34 00 35, 7219 35 00 05, 7219 35 00.15, 7219 35 00 30, 7219 35 00 35, 7219 90 00 10, 7219 90 00 20, 7219 90 00 25, 7219 90 00.60, 7219 90 00 80, 7220 12 10 00, 7220 12 50 00, 7220 20 10 10, 7220 20 10 15, 7220 20 10 60, 7220 20 10 80, 7220 20 60 05, 7220 20 60 10, 7220 20 60.15, 7220 20 60 60, 7220 20 60.80, 7220 20 70 05, 7220 20 70.10, 7220 20 70 15, 7220 20 70 60, 7220 20 70 80, 7220 20 80 00, 7220 20.90 30, 7220 20 90 60, 7220 90 00.10, 7220 90 00 15, 7220 90 00 60, and 7220 90 00 80.

Although the HTSUS subheadings are provided for convenience and customs purposes, the Department's written description of the merchandise covered by this order is dispositive

Excluded from the scope of this order are the following: (1) Sheet and strip that is not annealed or otherwise heat treated and pickled or otherwise descaled, (2) sheet and strip that is cut to length, (3) plate (*i e ,* flat–rolled stainless steel products of a thickness of 4 75 mm or more), (4) flat wire (*i e ,* cold–rolled sections, with a prepared edge, rectangular in shape, of a width of not more than 9.5 mm), and (5) razor blade steel. Razor blade steel is a flat–rolled product of stainless steel, not further worked than cold–rolled ("cold–reduced"), in coils, of a width of not more than 23 mm and a thickness of 0 266 mm or less, containing, by weight, 12.5 to 14 5 percent chromium, and certified at the time of entry to be used in the manufacture of razor blades *See* Chapter 72 of the HTSUS, "Additional U S. Note" 1(d)

In response to comments by interested parties, the Department also determined that certain specialty stainless steel products were excluded from the scope of the investigation and the subsequent order. These excluded products are described below

Flapper valve steel is defined as stainless steel strip in coils containing, by weight, between 0 37 and 0 43 percent carbon, between 1 15 and 1 35 percent molybdenum, and between 0 20 and 0 80 percent manganese This steel also contains, by weight, phosphorus of 0.025 percent or less, silicon of between 0 20 and 0 50 percent, and sulfur of 0 020 percent or less. The product is manufactured by means of vacuum arc remelting, with inclusion controls for sulphide of no more than 0.04 percent and for oxide of no more than 0 05 percent. Flapper valve steel has a tensile strength of between 210 and 300 ksi, yield strength of between 170 and 270 ksi, plus or minus 8 ksi, and a hardness ("Hv") of between 460 and 590. Flapper valve steel is most commonly used to produce specialty flapper valves in compressors

Also excluded is a product referred to as suspension foil, a specialty steel product used in the manufacture of suspension assemblies for computer disk drives. Suspension foil is described as 302/304 grade or 202 grade stainless steel of a thickness between 14 and 127 microns, with a thickness tolerance of plus–or–minus 2 01 microns, and surface glossiness of 200 to 700 percent Gs Suspension foil must be supplied in coil widths of not more than 407 mm, and with a mass of 225 kg or less. Roll marks may only be visible on one side, with no scratches of measurable depth The material must exhibit residual stresses of 2 mm maximum deflection and flatness of 1 6 mm over 685 mm length.

Certain stainless steel foil for automotive catalytic converters is also excluded from the scope of the order. This stainless steel strip in coils is a specialty foil with a thickness of between 20 and 110 microns used to produce a metallic substrate with a honeycomb structure for use in automotive catalytic converters. The steel contains, by weight, carbon of no more than 0 030 percent, silicon of no more than 1 0 percent, manganese of no more than 1 0 percent, chromium of between 19 and 22 percent, aluminum of no less than 5 0 percent, phosphorus of no more than 0 045 percent, sulfur of no more than 0 03 percent, lanthanum of less than 0.002 or greater than 0 05 percent, and total rare earth elements of more than 0 06 percent, with the balance iron. Permanent magnet iron–chromium–cobalt alloy stainless strip is also excluded from the scope of this order. This ductile stainless steel strip contains, by weight, 26 to 30 percent chromium, and 7 to 10 percent cobalt, with the remainder of iron, in widths 228 6 mm or less, and a thickness between 0 127 and 1 270 mm. It exhibits magnetic remanence between 9,000 and 12,000 gauss, and a coercivity of

between 50 and 300 oersteds. This product is most commonly used in electronic sensors and is currently available under proprietary trade names such as "Arnokrome III " "Arnokrome III" is a trademark of the Arnold Engineering Company

Certain electrical resistance alloy steel is also excluded from the scope of this order. This product is defined as a non–magnetic stainless steel manufactured to American Society of Testing and Materials ("ASTM") specification B344 and containing, by weight, 36 percent nickel, 18 percent chromium, and 46 percent iron, and is most notable for its resistance to high temperature corrosion It has a melting point of 1390 degrees Celsius and displays a creep rupture limit of 4 kilograms per square millimeter at 1000 degrees Celsius. This steel is most commonly used in the production of heating ribbons for circuit breakers and industrial furnaces, and in rheostats for railway locomotives. The product is currently available under proprietary trade names such as "Gilphy 36 " "Gilphy 36" is a trademark of Imphy, S A

Certain martensitic precipitation–hardenable stainless steel is also excluded from the scope of this order. This high–strength, ductile stainless steel product is designated under the Unified Numbering System ("UNS") as S45500–grade steel, and contains, by weight, 11 to 13 percent chromium, and 7 to 10 percent nickel. Carbon, manganese, silicon and molybdenum each comprise, by weight, 0 05 percent or less, with phosphorus and sulfur each comprising, by weight, 0.03 percent or less. This steel has copper, niobium, and titanium added to achieve aging, and will exhibit yield strengths as high as 1700 Mpa and ultimate tensile strengths as high as 1750 Mpa after aging, with elongation percentages of 3 percent or less in 50 mm. It is generally provided in thicknesses between 0 635 and 0.787 mm, and in widths of 25.4 mm. This product is most commonly used in the manufacture of television tubes and is currently available under proprietary trade names such as "Durphynox 17 " "Durphynox 17" is a trademark of Imphy, S.A

Finally, three specialty stainless steels typically used in certain industrial blades and surgical and medical instruments are also excluded from the scope of the order. These include stainless steel strip in coils used in the production of textile cutting tools (*e.g ,* carpet knives). This steel is similar to AISI grade 420, but containing, by weight, 0 5 to 0.7 percent of molybdenum The steel also contains, by weight, carbon of between 1 0 and

Federal Register / Vol. 70, No. 152 / Tuesday, August 9, 2005 / Notices

1.1 percent, sulfur of 0.020 percent or less, and includes between 0.20 and 0.30 percent copper and between 0.20 and 0.50 percent cobalt. This steel is sold under proprietary names such as "GIN4 Mo." The second excluded stainless steel strip in coils is similar to AISI 420–J2 and contains, by weight, carbon of between 0.62 and 0.70 percent, silicon of between 0.20 and 0.50 percent, manganese of between 0.45 and 0.80 percent, phosphorus of no more than 0.025 percent and sulfur of no more than 0.020 percent. This steel has a carbide density on average of 100 carbide particles per 100 square microns. An example of this product is "GIN5" steel. The third specialty steel has a chemical composition similar to AISI 420 F, with carbon of between 0.37 and 0.43 percent, molybdenum of between 1.15 and 1.35 percent, but lower manganese of between 0.20 and 0.80 percent, phosphorus of no more than 0.025 percent, silicon of between 0.20 and 0.50 percent, and sulfur of no more than 0.020 percent. This product is supplied with a hardness of more than Hv 500 guaranteed after customer processing, and is supplied as, for example, "GIN6." This list of uses is illustrative and provided for descriptive purposes only. "GIN4 Mo," "GIN5" and "GIN6" are the proprietary grades of Hitachi Metals America, Ltd.

**Partial Preliminary Rescission of Review**

Seven respondents, Ta Chen, Yieh Mau, Chain Chon, Tung Mung, Tang Eng, Yieh Loong, and China Steel, certified to the Department that they did not ship subject merchandise to the United States during the POR. The Department subsequently obtained CBP information in order to substantiate the respondents' claims. *See Memorandum From Melissa Blackledge To The File, U.S. Customs and Border Protection Data Query Results,* dated August 1, 2005. Thus, the evidence on the record does not indicate that Ta Chen, Yieh Mau, Chain Chon, Tung Mung, Tang Eng, Yieh Loong, or China Steel exported subject merchandise to the United States during the POR. Therefore, in accordance with 19 C.F.R § 351.213(d)(3) and consistent with the Department's practice, we are preliminarily rescinding our review with respect to Ta Chen, Yieh Mau, Chain Chon, Tung Mung, Tang Eng, Yieh Loong, and China Steel. *See, e.g., Certain Welded Carbon Steel Pipe and Tube from Turkey; Final Results and Partial Rescission of Antidumping Administrative Review,* 63 FR 35190, 35191 (June 29, 1998); *Certain Fresh Cut Flowers from Columbia; Final Results*

*and Partial Rescission of Antidumping Duty Administrative Review,* 62 FR 53287, 53288 (October 14, 1997)

**Partial Final Rescission of Review**

On October 27, 2004, the Department issued a letter to petitioners noting that while 19 C.F.R § 351.213 provides that domestic interested parties may request a review of "specified individual exporters or producers covered by the order," record information indicates the Emerdex companies are U.S. corporations located in California, rather than producers or exporters covered by the order on SSSS from Taiwan.[3] *See also* petitioners' September 10, 2004, submission to the Department. Therefore, we informed petitioners that the Department intends to rescind the instant review with respect to the Emerdex companies. Petitioners, however, claim that the following record information supports their contention that "Emerdex" is a Taiwanese exporter, supplier, or producer of subject merchandise: (1) a 2003 Dun & Bradstreet *Business Information Report* for Emerdex Stainless Flat Roll Products Inc. ("Emerdex Flat Roll") indicating the company "operates blast furnaces or steel mills, specializing in the manufacture of stainless steel," (2) Emerdex Flat Roll's 2003 U.S. income tax return indicating at least 25% of the company is owned by someone in Taiwan, 3) the 2002 financial statement of Ta Chen showing the second largest accounts payable balance for the company was owed to Emerdex. According to petitioners, the principal input used by Ta Chen in production is SSSS.[4] Based upon the above information, petitioners urge the Department to explore this matter further by issuing a series of questions regarding affiliation to any parent company that Emerdex might have in Taiwan (via Emerdex Flat Roll or Ta Chen)

Notwithstanding petitioners' arguments, we find it appropriate to rescind the instant review with respect to the Emerdex companies rather than undertake an examination of those U.S. companies, and their affiliates, in order to determine the appropriate

respondent. The party requesting an administrative review "must bear the relatively small burden imposed on it by the regulation to name names" of the appropriate respondent in its review request. *See Floral Trade Council of Davis, California v. United States, et al.,* 1993 WL 534598 (December 22, 1993). *See also Potassium Permanganate From the People's Republic of China: Rescission of Antidumping Duty Administrative Review,* 68 FR 58306, 58307 (October 9, 2003) (the Department rescinded the review noting that the party requested a review of a U.S importer, rather than an exporter or producer of subject merchandise) Where this burden has not been met, the "ITA is not required to conduct an investigation to determine who should be investigated in an administrative review proceeding." *See Floral Trade Council of Davis, California v. United States et al.,* 707 F. Supp. 1343, 1345 (February 16, 1989). Moreover, petitioners' failure to name the actual parties to be reviewed has deprived importers of notice that their imports could be affected by the review. As the Court of International Trade ("CIT") stated, the Department's initiation notice "serves to notify any interested party that the antidumping duty rate on goods obtained from exporters named in the notice of initiation for an administrative review may be affected by the outcome of that review. So apprised, "importers could participate in the administrative review in an effort to ensure that the calculation of antidumping duties on those products was correct." *See Transcom, Inc. and L&S Bearing Company v. United States,* 182 F.3d 876, 880 (June 16, 1999). Here, no such notice was given because petitioners failed to name the foreign exporters or producers to be reviewed.

Lastly, we note that none of the information placed on the record by petitioners demonstrates that there is an Emerdex parent corporation in Taiwan that produces or exports subject merchandise. The Dunn & Bradstreet report and Ta Chen's accounts payable balance relate to the Emerdex companies located in California, not companies located in Taiwan.[5]

---

[3] Neither petitioners, nor the Department, were able to locate any company in Taiwan named "Emerdex" or with "Emerdex" as part of its name.

[4] Ta Chen has been a respondent in the antidumping duty proceeding involving stainless steel butt-weld pipe fittings from Taiwan. In the 2002–2003 segment of that proceeding, the Department found Ta Chen to be affiliated to the Emerdex companies (these companies imported stainless steel-butt-weld pipe fittings into the United States). As noted above, Ta Chen is also a respondent in the instant administrative review.

[5] Additionally, the Department has obtained information from Dunn & Bradstreet indicating that Emerdex Flat Roll is a wholesaler of stainless steel products, not a producer. See the Memorandum From Melissa Blackledge To The File regarding the Dun & Bradstreet *Business Information Report* submitted by Collier Shannon Scott, PLLC on behalf of petitioners. The information the Department obtained from Dunn & Bradstreet is consistent with the business activity code reported for Emerdex Flat Roll in the company's 2003 U.S. income tax return and the information reported to the Department in
Continued

Furthermore, Emerdex Flat Roll's 2003 U.S. tax return does not state that the company has a parent corporation in Taiwan. Rather, the tax return simply notes that during the tax year, a "foreign person" in Taiwan owned, directly or indirectly, either 25% or more of the company's voting shares or 25% or more of the total value of all classes of the company's stock. The information in the tax return does not indicate that the "foreign person" is a company, let alone a company that produces or exports subject merchandise. Accordingly, the Department is rescinding the instant review with respect to the Emerdex companies.

**Use of Facts Available**

Section 776(a)(2) of the Tariff Act of 1930, as amended ("the Act"), provides that if any interested party: (A) withholds information that has been requested by the Department, (B) fails to provide such information by the deadlines for submission of the information or in the form or manner requested, (C) significantly impedes an antidumping investigation, or (D) provides such information but the information cannot be verified, the Department shall, subject to section 782(d) of the Act, use facts otherwise available in making its determination

Section 782(d) of the Act provides that, if the Department determines that a response to a request for information does not comply with the request, the Department will inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person the opportunity to remedy or explain the deficiency. If that person submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, the Department may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.

The evidence on the record of this review establishes that, pursuant to section 776(a)(2)(A) of the Act, the use of total facts available is warranted in determining the dumping margin for PFP Taiwan, Yieh Trading, Goang Jau Shing, and Chien Shing, because these companies failed to provide requested information. Specifically, these companies failed to respond to the

the 2002-2003 administrative review of stainless steel butt-weld pipe fittings from Taiwan. See Ta Chen's January 23, 2004, supplemental questionnaire response (at B-2) from the stainless steel butt-weld pipe fittings case (on November 5, 2004, at Enclosure 6, petitioners placed this page on the record of the instant review).

Department's antidumping questionnaire.

On November 10, 2004, the Department informed these companies by letter that failure to respond to the requests for information by November 17, 2004, may result in the use of AFA in determining their dumping margins. These four manufacturers/exporters, however, did not respond to the Department's November 10, 2004, letter. Because these respondents failed to provide any of the necessary information requested by the Department, pursuant to section 776(a)(2)(A) of the Act, we have based the dumping margins for these companies on the facts otherwise available.

**Use of Adverse Inferences**

Section 776(b) of the Act states that if the Department "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission ..., in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." See also Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act (URAA), H. Rep. No. 103–316 at 870 (1994). Section 776(b) of the Act goes on to note that an adverse inference may include reliance on information derived from (1) the petition; (2) a final determination in the investigation under this title; (3) any previous review under section 751 or determination under section 753; or (4) any other information on the record.

Adverse inferences are appropriate "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." See SAA at 870; Borden, Inc. v. United States, 4 F. Supp. 2d 1221 (CIT 1998); Mannesmannrohren–Werke AG v. United States, 77 F. Supp. 2d 1302 (CIT 1999). The Court of Appeals for the Federal Circuit ("CAFC"), in Nippon Steel Corporation v. United States, 337 F.3d 1373, 1380 (Fed. Cir. 2003), provided an explanation of the "failure to act to the best of its ability" standard, holding that the Department need not show intentional conduct existed on the part of the respondent, but merely that a "failure to cooperate to the best of a respondent's ability" existed, i.e., information was not provided "under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." Id.

The record shows that PFP Taiwan, Yieh Trading, Goang Jau Shing, and Chien Shing failed to cooperate to the best of their abilities, within the meaning of section 776(b) of the Act. As noted above, PFP Taiwan, Yieh Trading, Goang Jau Shing, and Chien Shing failed to provide any response to the Department's requests for information. As a general matter, it is reasonable for the Department to assume that these companies possessed the records necessary to participate in this review; however, by not supplying the information the Department requested, these companies failed to cooperate to the best of their abilities. As these companies have failed to cooperate to the best of their abilities, we are applying an adverse inference in determining their dumping margin pursuant to section 776(b) of the Act. As AFA, we have assigned these companies a dumping margin of 21.10 percent, which is the highest appropriate dumping margin from this or any prior segment of the instant proceeding. This rate was the highest petition margin and was used as AFA in a number of the segments in the instant proceeding. See, e.g., Stainless Steel Sheet and Strip from Taiwan; Final Results and Partial Rescission of Antidumping Duty Administrative Review, 67 FR 6682 (February 13, 2002) ("1999–2000 AR of SSSS from Taiwan"). See also Stainless Steel Sheet and Strip in Coils from Taiwan: Notice of Court Decision, 67 FR 63887 (October 16, 2002).

The Department notes that while the highest dumping margin calculated during this or any prior segment of the instant proceeding is 36.44 percent, as argued by petitioners, this margin represents a combined rate applied to a channel transaction in the investigative phase of this proceeding, and it is based on middleman dumping by Ta Chen. See Final Results of Redetermination Pursuant to Court Remand, (Nov. 29, 2000) affirmed by 219 F. Supp. 2d 1333, 1345 (CIT 2002), aff'd 354 F.3d 1371, 1382 (Fed. Cir. 2004). Where circumstances indicate that a particular dumping margin is not appropriate as AFA, the Department will disregard the margin and determine another more appropriate one as facts available. See Fresh Cut Flowers from Mexico; Final Results of Antidumping Duty Administrative Review, 61 FR 6812, 6814 (February 22, 1996) (where the Department disregarded the highest dumping margin for use as AFA because the margin was based on another company's uncharacteristic business expense, resulting in an unusually high dumping margin). Because a dumping

Federal Register / Vol. 70, No. 152 / Tuesday, August 9, 2005 / Notices

margin based on middleman dumping would be inappropriate, given that the record does not indicate that any of PFP Taiwan's, Yieh Trading's, Goang Jau Shing's, and Chien Shing's exports to the United States during the POR involved a middleman, the Department has, consistent with previous reviews, continued to use as AFA the highest dumping margin from any segment of the proceeding for a producer's direct exports to the United States, without middleman dumping, which is 21.10 percent.

Section 776(c) of the Act requires that the Department, to the extent practicable, corroborate secondary information from independent sources that are reasonably at its disposal. Secondary information is defined as ''{i}nformation derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise.'' *See* SAA at 870. The SAA clarifies that ''corroborate'' means that the Department will satisfy itself that the secondary information to be used has probative value. *See* SAA at 870. As noted in *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), to corroborate secondary information, the Department will, to the extent practicable, examine the reliability and relevance of the information.

The rate of 21.10 percent constitutes secondary information. The Department corroborated the information used to establish the 21.10 percent rate in the less than fair value (''LTFV'') investigation in this proceeding, finding the information to be both reliable and relevant. *See Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Taiwan*, 64 FR 30592, 30592 (June 8, 1999) (''*Final Determination*''); *see also 1999–2000 AR of SSSS from Taiwan*, 67 FR 6682, 6684 and accompanying *Issues and Decision Memorandum* at Comment 28. Nothing on the record of this instant administrative review calls into question the reliability of this rate. Furthermore, with respect to the relevancy aspect of corroboration, the Department will consider information reasonably at its disposal as to whether there are circumstances that would render a margin not relevant. As discussed above, in selecting this

margin, the Department considered whether a margin derived from middleman dumping was relevant to PFP Taiwan's, Yieh Trading's, Goang Jau Shing's, and Chien Shing's commercial experience, and determined the use of this margin was inappropriate. The Department has determined that there is no evidence on the record of this case, however, which would render the 21.10 percent dumping margin irrelevant. Thus, we find that the rate of 21.10 percent is sufficiently corroborated for purposes of the instant administrative review.

### Affiliation

#### YUSCO

During the course of this administrative review, petitioners have argued that YUSCO is under common control with certain companies, and thus it is affiliated with these companies. Specifically, petitioners contend that through direct and indirect interests and Board of Director positions associated with YUSCO's Chairman, Mr. Lin, YUSCO is affiliated with a number of companies, including Yieh Loong and China Steel. As has been the case in prior segments of this proceeding, we find that the facts on the record do not demonstrate that YUSCO is affiliated with Yieh Loong or China Steel. Nor do we conclude that the facts support a finding that YUSCO is affiliated with any of the other companies identified by petitioners. Because our discussion of this issue necessitates the use of business proprietary information, we have addressed the issue in the memorandum to Barbara E. Tillman, Acting Deputy Assistant Secretary for Import Administration, covering the subject of affiliation.

#### Chia Far

During the first administrative review in this proceeding, the Department found Chia Far and its U.S. reseller, Lucky Medsup Inc. (''Lucky Medsup''), to be affiliated by way of a principal–agency relationship. The Department primarily based its finding on: (1) a document evidencing the existence of a principal–agent relationship, (2) Chia Far's degree of involvement in sales between Lucky Medsup and its customers, (3) evidence indicating Chia Far knew the identity of Lucky Medsup's customers, and the customers were aware of Chia Far, (4) Lucky Medsup's operations as a ''go-through'' who did not maintain any inventory or further manufacture products, and (5) Chia Far's inability to provide any documents to support its claim that the document evidencing the principal–

agent relationship was not valid during the POR. *See Stainless Steel Sheet and Strip in Coils from Taiwan: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 FR 6682 (February 13, 2002) and the accompanying *Issues and Decision Memorandum* at Comment 23 (upheld by CIT in *Chia Far Industrial Factory Co. Ltd. v. United States, et al*, 343 F. Supp. 2d 1344, 1356 (August 2, 2004)). The Department has continued to treat Chia Far and Lucky Medsup as affiliated parties throughout this proceeding.

In the instant administrative review, however, Chia Far contends that it is no longer affiliated with Lucky Medsup because: (1) there is no cross-ownership between Chia Far and Lucky Medsup and no sharing of officers or directors, (2) Lucky Medsup's owner operates independently of Chia Far as a middleman, (3) Lucky Medsup's transactions with Chia Far are at arm's length, (4) there are no exclusive distribution contracts between Lucky Medsup and Chia Far (the one that existed in 1994, was terminated in 1995), and (5) Lucky Medsup is not obligated to sell Chia Far's merchandise and Chia Far is not obligated to sell through Lucky Medsup in the United States.

We, however, find the fact pattern in the instant review mirrors that which existed when the Department found the parties to be affiliated. First and foremost, Chia Far could not provide any documents in response to the Department's request that it demonstrate that the agency agreement was terminated and the principal–agent relationship no longer exists. *See* Chia Far's March 25, 2002, supplemental questionnaire response at page 1. Furthermore, Chia Far's degree of involvement in Lucky Medsup's U.S. sales is similar to that found in prior reviews. Specifically, Chia Far played a role in the sales negotiation process with the end-customer (Chia Far was informed of the identity of the end-customers and the sales terms that they had requested before it set its price to Luck Medsup), Lucky Medsup's sales order confirmation identifies Chia Far as the manufacturer, and Chia Far shipped the merchandise directly to end-customers and provided technical assistance directly to certain end-customers. Lastly, as was true in prior segments of this proceeding, during the instant POR Lucky Medsup did not maintain inventory or further manufacture SSSS. Therefore, we continue to find that Chia Far is affiliated with Lucky Medsup.

## Identifying Home Market Sales

Section 773 (a)(1)(B) of the Act defines NV as the price at which foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country (home market), in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price ("EP") or constructed export price ("CEP"). In implementing this provision, the CIT has found that sales should be reported as home market sales if the producer "knew or should have known that the merchandise {it sold} was for home consumption based upon the particular facts and circumstances surrounding the sale." *See Tung Mung Development Co., Ltd. & Yieh United Steel Corp. v. United States and Allegheny Ludlum Corp., et al.*, Slip Op 01–83 (CIT 2001); *citing INA Walzlager Schaeffler KG v. United States*, 957 F Supp. 251 (1997). Conversely, if the producer knew or should have known the merchandise that it sold to home market customers was not for home market consumption, it should exclude such sales from its home market sales database. Even though a producer may sell merchandise destined for exportation by a home market customer, if that merchandise is used to produce non–subject merchandise in the home market, it is consumed in the home market and such sales will be considered to be home market sales. *See Final Determination of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Plate Products, Certain Corrosion–Resistant Carbon Steel Flat Products, and Certain Cut–to–Length Carbon Steel Plate From Korea*, 58 FR 37176, 37182 (July 9, 1993).

The issue of whether respondents have properly reported home market sales has arisen in each of the prior segments of the instant proceeding. It is also an issue in the instant administrative review.

### YUSCO

Throughout the instant administrative review, petitioners have questioned the accuracy of YUSCO's home market sales database. Specifically, petitioners claim that YUSCO has not properly addressed the very important part of the Department's knowledge test - consumption of YUSCO's merchandise in Taiwan before exportation. As a result, petitioners maintain that the Department cannot rely upon the sales databases submitted by YUSCO and must base the company's dumping

margin on total AFA. *See* petitioners' April 14, 2005, and April 28, 2005, submissions to the Department

For these preliminary results, we have not rejected YUSCO's sales databases in favor of total AFA because information on the record indicates that YUSCO knew, or should have known, the merchandise that it sold was for consumption in the home market based upon the particular facts and circumstances surrounding the sales Thus, there is information on the record that allows the Department to identify YUSCO's home market sales. Specifically, YUSCO reported that it sold SSSS to a certain home market customer who was planning to further process the SSSS into non–subject merchandise and then export the merchandise. Further, YUSCO delivered the merchandise to this customer at a location that had facilities to further process the SSSS into non–subject merchandise. YUSCO reported these sales in its HM3 database. *See* YUSCO's April 4, 2005, supplemental questionnaire response at 11. Because the record indicates that YUSCO knew at the time of sale that this merchandise would be consumed in the home market, the Department has preliminarily considered sales to this home market customer to be home market sales. In its HM4 database YUSCO reported its sales to an affiliated home market customer, who has the ability to further process the SSSS into non–subject merchandise but did not inform YUSCO about its plans regarding possible further manufacturing prior to exportation. YUSCO delivered these sales to the affiliated customer's processing plant. *See* YUSCO's November 22, 2004, Sections B–C questionnaire response at 2, 3 Consistent with the approach taken in the prior administrative review of this order, we have considered YUSCO's sales to an affiliated home market customer delivered to the customer's further processing plant to be home market sales

### Chia Far

In its November 15, 2004, questionnaire response, Chia Far stated that it has reason to believe that some of the home market customers to whom it sold SSSS during the POR may have exported the merchandise. Specifically, Chia Far indicated that it shipped some of the SSSS it sold to home market customers during the POR to a container yard or placed the SSSS in an ocean shipping container at the home market customer's request. Chia Far stated that even though the merchandise was containerized or sent to a container

yard, it could not prove the merchandise was exported to a third country, and therefore, it included those sales in its reported home market sales Although Chia Far stated that it does not definitively know whether the SSSS in question will be exported, the Department has preliminarily determined that, based the fact that these sales were sent to a container yard or placed in a container by Chia Far at the request of the home market customer, Chia Far should have known that the SSSS in question was not for consumption in the home market Therefore, the Department has preliminarily excluded these sales from Chia Far's home market sales database

## Comparison Methodology

In order to determine whether the respondents sold SSSS to the United States at prices less than NV, the Department compared the EP and CEP of individual U S. sales to the monthly weighted–average NV of sales of the foreign like product made in the ordinary course of trade *See* section 777A(d)(2) of the Act; *see also* section 773(a)(1)(B)(i) of the Act. Section 771(16) of the Act defines foreign like product as merchandise that is identical or similar to subject merchandise and produced by the same person and in the same country as the subject merchandise. Thus, we considered all products covered by the scope of the order, that were produced by the same person and in the same country as the subject merchandise, and sold by YUSCO and Chia Far in the comparison market during the POR, to be foreign like products, for the purpose of determining appropriate product comparisons to SSSS sold in the United States. During the POR, Chia Far sold subject merchandise and foreign like product that it made from hot- and cold–rolled stainless steel coils (products covered by the scope of the order) purchased from unaffiliated parties. Chia Far further processed the hot- and cold–rolled stainless steel coils by performing one or more of the following procedures: cold–rolling, bright annealing, surface finishing/ shaping, slitting. We did not consider Chia Far to be the producer of the merchandise under review if it performed insignificant processing on the coils (e.g., annealing, slitting, surface finishing) *See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and the accompanying *Issues and Decision Memorandum* at Comment 4 (listing painting, slitting, finishing, pickling,

oiling, and annealing as minor processing for flat–rolled products). Furthermore, we did not consider Chia Far to be the producer of the cold–rolled products that it sold if it was not the first party to cold roll the coils. The cold–rolling process changes the surface quality and mechanical properties of the product and produces useful combinations of hardness, strength, stiffness, and ductility. Further cold–rolling does not appear to change the fundamental character of a product that has already been cold–rolled. Thus, we considered the original party that cold–rolled the product to be its producer.

The Department compared U.S. sales to sales made in the comparison market within the contemporaneous window period, which extends from three months prior to the U.S. sale until two months after the sale. Where there were no sales of identical merchandise made in the comparison market in the ordinary course of trade, the Department compared U.S. sales to sales of the most similar foreign like product made in the ordinary course of trade. In making product comparisons, the Department selected identical and most similar foreign like products based on the physical characteristics reported by the respondents in the following order of importance: grade, hot- or cold–rolled, gauge, surface finish, metallic coating, non–metallic coating, width, temper, and edge. Where there were no appropriate sales of the foreign like product to compare to a U.S. sale, we compared the price of the U.S. sale to constructed value ("CV"), in accordance with section 773(a)(4) of the Act.

### Export Price and Constructed Export Price

The Department based the price of each of YUSCO's U.S. sales of subject merchandise on EP, as defined in section 772(a) of the Act, because the merchandise was sold, prior to importation, to unaffiliated purchasers in the United States, and CEP was not otherwise warranted based on the facts of the record. We calculated EP using packed prices to unaffiliated purchasers in the United States from which we deducted, where applicable, inland freight expenses (from YUSCO's plant to the port of exportation), international freight expenses, brokerage and handling charges, container handling fees, and certification fees in accordance with section 772(c) of the Act.

We based the price of Chia Far's U.S. sales of subject merchandise on EP or CEP, as appropriate. Specifically, when Chia Far sold subject merchandise to unaffiliated purchasers in the United States prior to importation, and CEP was

not otherwise warranted based on the facts of the record, we based the price of the sale on EP, in accordance with section 772 (a) of the Act. On the other hand, when Chia Far sold subject merchandise to unaffiliated purchasers in the United States after importation through its U.S. affiliate, Lucky Medsup, we based the price of the sale on CEP, in accordance with section 773(b) of the Act. Although Chia Far based the date of sale for its EP and CEP transactions on the order confirmation date, in response to questions from the Department, Chia Far reported information showing that the material terms of U.S. sales changed after the order confirmation date (e.g., changes to the ordered quantity in excess of the allowable variation). See Chia Far's March 18, 2005, supplemental questionnaire response at page 5 and attachment C–21. See also Chia Far's December 13, 2004, supplemental questionnaire response at page 6 where Chia Far indicated the material terms of U.S. sales can change after the initial agreement.

Normally, the Department considers the respondent's invoice date as recorded in its business records to be the date of sale unless a date other than the invoice date better reflects the date on which the company establishes the material terms of sale. See 19 C.F.R. § 351.401(i). Given that changes to the material terms of sale occurred after the order confirmation date, the record does not support using the reported date of sale. Therefore, we have preliminarily used invoice date as the date of sale for Chia Far's EP and CEP transactions. However, consistent with the Department's practice, where the invoice was issued after the date of shipment to the first unaffiliated U.S. customer, we relied upon the date of shipment as the date of sale. See Certain Cold–Rolled and Corrosion Resistant Carbon Steel Flat Products From Korea; Final Results of Antidumping Duty Administrative Reviews, 64 FR 12927, 12935 (March 16, 1999), citing Certain Cold–Rolled and Corrosion Resistant Carbon Steel Flat Products From Korea; Final Results of Antidumping Duty Administrative Reviews, 63 FR 13170, 13172–73 (March 18, 1998) ("in these final results we have followed the Department's methodology from the final results of the third reviews, and have based date of sale on invoice date from the U.S. affiliate, unless that date was subsequent to the date of shipment from Korea, in which case that shipment date is the date of sale.")

We calculated EP using packed prices to unaffiliated purchasers in the United States from which we deducted, where

applicable, foreign inland freight expense (from Chia Far's plant to the port of exportation), brokerage and handling expense, international ocean freight expense, marine insurance expense, container handling charges, and harbor construction fees. Additionally, we added to the starting price an amount for duty drawback pursuant to section 772(c)(1)(B) of the Act. We calculated CEP using packed prices to the first unaffiliated purchaser in the United States from which we deducted foreign inland freight expense (from Chia Far's plant to the port of exportation), brokerage and handling expense, international ocean freight expense, marine and inland insurance expense, container handling charges, harbor construction fees, other U.S. transportation expenses and U.S. duty. Additionally, we added to the starting price an amount for duty drawback pursuant to section 772(c)(1)(B) of the Act. In accordance with section 772(d)(1) of the Act, we deducted from the starting price selling expenses associated with economic activities occurring in the United States, including direct and indirect selling expenses. Furthermore, we deducted from the starting price the profit allocated to expenses deducted under sections 772(d)(1) and (d)(2) of the Act in accordance with sections 772(d)(3) and 772(f) of the Act. We computed profit by deducting from total revenue realized on sales in both the U.S. and comparison markets, all expenses associated with those sales. We then allocated profit to expenses incurred with respect to U.S. economic activity, based on the ratio of total U.S. expenses to total expenses for both the U.S. and comparison markets.

### Normal Value

After testing home market viability, whether comparison–market sales to affiliates were at arm's–length prices, and whether comparison–market sales were at below–cost prices, we calculated NV as noted in the "Price–to–Price Comparisons" and "Price–to–CV Comparisons" sections of this notice.

#### 1. Home Market Viability

In accordance with section 773(a)(1)(B) of the Act, to determine whether there was a sufficient volume of sales in the home market to serve as a viable basis for calculating NV (i.e., the aggregate volume of home market sales of the foreign like product is greater than or equal to five percent of the aggregate volume of U.S. sales), we separately compared the aggregate volume of YUSCO's and Chia Far's home market sales of the foreign like

product to the aggregate volume of their U.S. sales of subject merchandise. Because the aggregate volume of YUSCO's and Chia Far's home market sales of the foreign like product is greater than five percent of the aggregate volume of their respective U.S. sales of subject merchandise, we determined that the home market is viable for each of these respondents and have used the home market as the comparison market.

2. Arm's–Length Test

YUSCO reported that it made sales in the home market to affiliated and unaffiliated end users and distributors/retailers. The Department will calculate NV based on sales to an affiliated party only if it is satisfied that the prices charged to the affiliated party are comparable to the prices charged to parties not affiliated with the producer, i.e., the sales are at arm's–length. See section 773(f)(2) of the Act and 19 C.F.R. § 351.403(c). Where the home market prices charged to an affiliated customer were, on average, found not to be arm's–length prices, sales to the affiliated customer were excluded from our analysis. To test whether YUSCO's sales to affiliates were made at arm's–length prices, the Department compared the starting prices of sales to affiliated and unaffiliated customers net of all movement charges, direct selling expenses, and packing. Pursuant to 19 C.F.R. § 351.403(c), and in accordance with the Department's practice, when the prices charged to affiliated parties were, on average, between 98 and 102 percent of the prices charged to unaffiliated parties for merchandise comparable to that sold to the affiliated party, we determined that the sales to the affiliated party were at arm's–length prices. See Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade, 67 FR 69186 (November 15, 2002). YUSCO's affiliated home market customer did not pass the arm's–length test. Therefore, we have disregarded YUSCO's sales to its affiliated home market customer in favor of that customer's downstream sales of foreign like product to its first unaffiliated customer.

3. Cost of Production ("COP") Analysis

In the previous administrative review in this proceeding, the Department determined that YUSCO and Chia Far sold the foreign like product in the home market at prices below the cost of producing the merchandise and excluded such sales from the calculation of NV. Based on the results of the previous administrative review, the Department determined that there are reasonable grounds to believe or

suspect that during the instant POR, YUSCO and Chia Far sold the foreign like product in the home market at prices below the cost of producing the merchandise. See section 773(b)(2)(A)(ii) of the Act. As a result, the Department initiated a COP inquiry for both YUSCO and Chia Far.

A. Calculation of COP

In accordance with section 773(b)(3) of the Act, for each unique foreign like product sold by the respondents during the POR, we calculated a weighted–average COP based on the sum of the respondent's materials and fabrication costs, home market selling general and administrative ("SG&A") expenses, including interest expenses, and packing costs. We made the following adjustments to YUSCO's cost data: (1) we increased the reported cost of inputs purchased from affiliated suppliers to reflect the higher of the transfer price or market price as required by section 773(f)(2) of the Act, and (2) we adjusted YUSCO's reported general and administrative (G&A) expense ratio to exclude certain income. See Analysis Memorandum for the Preliminary Results of Review for Stainless Steel Sheet and Strip in Coils From Taiwan Yieh United Steel Corp., Ltd. (August 1, 2005) ("YUSCO Preliminary Analysis Memorandum"). See also Analysis Memorandum for the Preliminary Results of Review for Stainless Steel Sheet and Strip in Coils From Taiwan - Chia Far Industrial Factory Co., Ltd. (August 1, 2005) ("Chia Far Preliminary Analysis Memorandum").

B. Test of Home Market Prices

In order to determine whether sales were made at prices below the COP, on a product–specific basis we compared each respondent's weighted–average COPs, adjusted as noted above, to the prices of its home market sales of foreign like product, as required under section 773(b) of the Act. In accordance with section 773(b)(1)(A) and (B) of the Act, in determining whether to disregard home market sales made at prices less than the COP, we examined whether such sales were made: (1) in substantial quantities within an extended period of time, and (2) at prices which permitted the recovery of all costs within a reasonable period of time. We compared the COP to home market sales prices, less any applicable movement charges and discounts.

C. Results of the COP Test

Pursuant to section 773(b)(2)(C) of the Act, where less than 20 percent of a respondent's sales of a given product were made at prices less than the COP,

we did not disregard any below–cost sales of that product because the below–cost sales were not made in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product were made at prices less than the COP during the POR, we determined such sales to have been made in "substantial quantities" and within an extended period of time pursuant to sections 773(b)(2)(B) and (C) of the Act. In such cases, because we used POR average costs, we also determined, in accordance with section 773(b)(2)(D) of the Act, that such sales were not made at prices which would permit recovery of all costs within a reasonable period of time. Based on this test, we disregarded below–cost sales. Where all sales of a specific product were at prices below the COP, we disregarded all sales of that product.

Price-to-Price Comparisons

Where it was appropriate to base NV on prices, we used the prices at which the foreign like product was first sold for consumption in Taiwan, in usual commercial quantities, in the ordinary course of trade, and, to the extent possible, at the same level of trade ("LOT") as the comparison EP or CEP sale.

We based NV on the prices of home market sales to unaffiliated customers and to affiliated customers to whom sales were made at arm's–length prices. We excluded from our analysis home market sales of merchandise identified by the Department as having been manufactured by parties other than the respondents. Merchandise manufactured by parties other than the respondents was not sold in the U.S. market during the POR. We made price adjustments, where appropriate, for physical differences in the merchandise in accordance with section 773(a)(6)(C)(ii) of the Act. In accordance with sections 773(a)(6)(A), (B), and (C) of the Act, where appropriate, we deducted from the starting price rebates, warranty expenses, movement expenses, home market packing costs, credit expenses and other direct selling expenses and added U.S. packing costs and, for NVs compared to EPs, credit expenses, and other direct selling expenses. In accordance with the Department's practice, where all contemporaneous matches to a U.S. sale resulted in difference–in–merchandise adjustments exceeding 20 percent of the cost of manufacturing the U.S. product, we based NV on CV.

Price-to-CV Comparisons

In accordance with section 773(a)(4) of the Act, we based NV on CV when

we were unable to compare the U.S. sale to a home market sale of an identical or similar product. For each unique SSSS product sold by the respondents in the United States during the POR, we calculated a weighted–average CV based on the sum of the respondent's materials and fabrication costs, SG&A expenses, including interest expenses, packing costs, and profit. In accordance with section 773(e)(2)(A) of the Act, we based SG&A expenses and profit on the amounts incurred and realized by the respondent in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in Taiwan. We based selling expenses on weighted–average actual home market direct and indirect selling expenses. In calculating CV, we adjusted the reported costs as described in the COP section above.

**Level of Trade**

In accordance with section 773(a)(1)(B) of the Act, to the extent practicable, we determined NV based on sales in the comparison market at the same LOT as the EP or CEP sales. For NV, the LOT is based upon the level of the starting–price sales in the comparison market or, when NV is based on CV, that of the sales from which we derive SG&A expenses and profit. For EP sales, the U.S. LOT is also based upon the level of the starting price sale, which is usually from the exporter to the importer. For CEP sales, it is the level of the constructed sale from the exporter to the importer. The Department adjusts CEP, pursuant to section 772(d) of the Act, prior to performing the LOT analysis, as articulated by 19 C.F.R. § 351.412. *See Micron Technology, Inc. v. United States*, 243 F.3d, 1301, 1315 (Fed. Cir. 2001).

To determine whether NV sales are at a different LOT than the EP or CEP sales, we examine stages in the marketing process and selling functions along the chain of distribution between the producer and the unaffiliated customer. If the comparison–market sales are at a different LOT, and the difference affects price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison–market sales at the LOT of the export transaction, we make a LOT adjustment under section 773(a)(7)(A) of the Act. Finally, for CEP sales, if the NV level is more remote from the factory than the CEP level and there is no basis for determining whether the difference in the levels between NV and CEP affects price comparability, we adjust NV under section 773(A)(7)(B) of the Act.

(the CEP offset provision). *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Plate from South Africa*, 62 FR 61731 (November 19, 1997).

In determining whether separate LOTs exist, we obtained information from YUSCO and Chia Far regarding the marketing stages for the reported U.S. and home market sales, including a description of the selling activities performed by YUSCO and Chia Far for each channel of distribution. Generally, if the reported LOTs are the same, the functions and activities of the seller at each level should be similar. Conversely, if a party reports that LOTs are different for different groups of sales, the selling functions and activities of the seller for each group should be dissimilar.

YUSCO reported that it sold foreign like product in the home market through one channel of distribution and at one LOT. *See* YUSCO's November 22, 2004, Questionnaire Response at B–29. In this channel of distribution, YUSCO provided the following selling functions: inland freight, invoicing, packing, warranty services, and technical advice. Because there is only one sales channel in the home market involving similar functions for all sales, we preliminarily determine that there is one LOT in the home market.

In addition, YUSCO reported that it sold subject merchandise to customers in the United States through one channel of distribution and at one LOT. *See* YUSCO's November 15, 2004, Questionnaire Response at A–14. In this channel of distribution, YUSCO provided the following selling functions: arranging freight and delivery, invoicing, and packing. YUSCO did not incur any other expenses in the United States for its U.S. sales. Because the one sales channel in the United States involves similar functions for all sales, we preliminarily determine that there is one LOT in the United States.

Based upon our analysis of the selling functions performed by YUSCO, we preliminarily determine that YUSCO sold the foreign like product and subject merchandise at the same LOT. Although YUSCO provided technical advice and warranty services in the home market, but not in the U.S. market, these services were rarely provided in the home market and thus, there is no significant difference between the selling functions performed in the home and U.S. markets. Therefore, we preliminarily determine that a LOT adjustment is not warranted.

Chia Far reported that it sold subject merchandise in the home market to two

types of customers, distributors and end users, through one channel of distribution. Chia Far provided the same selling functions for home market sales to both customer categories, such as providing technical advice, making freight and delivery arrangements, processing orders, providing after–sale warehousing, providing after–sale packing services, performing warranty services, and post–sale processing. *See* Chia Far's September 22, 2004, Section A Questionnaire Response at Exhibit A–6. Based on the similarity of the selling functions and the fact that one channel of distribution serviced the two types of customers, we preliminarily determine that there is one LOT in the home market.

For the U.S. market, Chia Far reported that it made sales to unaffiliated distributors directly and through its U.S. affiliate, Lucky Medsup. Since the Department bases the LOT of CEP sales on the price in the United States after making CEP deductions under section 772(d) of the Act, we based the LOT of Chia Far's CEP sales on the price after deducting selling expenses.

Chia Far performed the same selling functions, such as arranging freight and delivery, providing after–sale packing services, processing orders, providing technical advice, and performing warranty services for all U.S. customers, including Lucky Medsup's customers. *See* Chia Far's September 22, 2004, Section A Questionnaire Response at Exhibit A–6. Based on the similarity of selling functions to the same customer type, we preliminarily determine that there is one LOT in the United States.

To determine whether NV is at a different LOT than the U.S. transactions, the Department compared home market selling activities with those for EP and CEP transactions. The Department made the comparison after deducting expenses associated with selling activities occurring in the United States from the CEP. *See* section 772(d) of the Act. Chia Far engaged in the following selling activities for both the home and U.S. markets: providing technical advice, warranty services, freight and delivery arrangements, packing, and order processing. *See* AQR at Exhibit A–6 and A–7. Chia Far's selling activities in the home and U.S. markets differed in that additional activity was required to ship subject merchandise to U.S. customers (*i.e.*, arranging international freight and marine insurance) and it engaged in post–sale processing and post–sale warehousing in the home market, but not the U.S. market. While Chia Far may have engaged in certain selling activities in the home market that it did not perform in the U.S.

**46146**      **Federal Register** / Vol. 70, No. 152 / Tuesday, August 9, 2005 / Notices

market, according to Chia Far, the significance of these activities is minimal. Based on the foregoing, the Department determined that the differences between the home and U.S. market selling activities do not support a finding that Chia Far's sales in the home market were made at a different LOT than U.S. sales.

In its questionnaire response, Chia Far requested a CEP offset (noting that there is only one LOT in the home market). See AQR at A–14. The Department will grant a CEP offset if NV is at a more advanced LOT than the CEP transactions and there is no basis for determining whether the difference in the levels between NV and CEP affects price comparability (e.g., a LOT adjustment is not possible because there is only one LOT in the home market). Here, the Department has not found the NV LOT to be more advanced than the CEP LOT and thus, it has not granted Chia Far a CEP offset.

**Currency Conversion**

Pursuant to section 773A(a) of the Act, we converted amounts expressed in foreign currencies into U.S. dollar amounts based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

**Preliminary Results of Review**

As a result of this review, we preliminarily determine that the following weighted–average dumping margins exist for the period July 1, 2003, through June 30, 2004:

| Manufacturer/Exporter/ Reseller | Weighted–Average Margin (percentage) |
|---|---|
| Yieh United Steel Corporation ("YUSCO") | 0.00 |
| Chia Far Industrial Factory Co., Ltd. ("Chia Far") | 1.37 |
| Goang Jau Shing Enterprise Co., Ltd. | 21.10 |
| PFP Taiwan Co., Ltd | 21.10 |
| Yieh Trading Corporation | 21.10 |
| Chien Shing Stainless Steel Company Ltd | 21.10 |

**Assessment Rates**

Upon completion of this administrative review, the Department shall determine, and CBP shall assess, antidumping duties on all appropriate entries. In accordance with 19 C.F.R. § 351.212(b)(1), where possible, the Department calculated importer–specific assessment rates for merchandise subject to this review. Where the importer–specific assessment rate is above de minimis, we will

instruct CBP to assess the importer–specific rate uniformly on the entered customs value of all entries of subject merchandise made by the importer during the POR. Since YUSCO did not report the entered value of its sales, we calculated per–unit assessment rates for its merchandise by aggregating the dumping margins calculated for all U.S. sales to each importer and dividing that amount by the total quantity of those sales. To determine whether the per–unit duty assessment rates were de minimis (i.e., less than 0.50 percent ad valorem), in accordance with the requirement set forth in 19 C.F.R. § 351.106(c)(2), we calculated importer–specific ad valorem ratios based on the export prices. For the respondents receiving dumping margins based upon AFA, the Department will instruct CBP to liquidate entries according to the AFA ad valorem rate. The Department will issue appropriate appraisement instructions directly to CBP within 15 days of publication of the final results of review.

**Cash Deposit Rates**

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(1) of the Act: (1) the cash deposit rate for each of the reviewed companies will be the rate listed in the final results of this review (except if the rate for a particular company is de minimis, i.e., less than 0.5 percent, no cash deposit will be required for that company), (2) for previously reviewed or investigated companies not listed above, the cash deposit rate will continue to be the company–specific rate published for the most recent review period, (3) if the exporter is not a firm covered in this review, a prior review, or the less–than–fair–value (LTFV) investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent period for the manufacturer of the subject merchandise, and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 12.61 percent, the "all others" rate established in the LTFV investigation. See Final Determination, 64 FR 30592. These required cash deposit rates, when imposed, shall remain in effect until publication of the final results of the next administrative review.

**Public Comment**

According to 19 C.F.R. § 351.224(b), the Department will disclose any calculations performed in connection with the preliminary results of review within 10 days of publicly announcing the preliminary results of review. Any interested party may request a hearing within 30 days of publication of this notice. See 19 C.F.R. § 351.310(c). If requested, a hearing will be held 44 days after the date of publication of this notice, or the first workday thereafter. Interested parties are invited to comment on the preliminary results. The Department will consider case briefs filed by interested parties within 30 days after the date of publication of this notice. Also, interested parties may file rebuttal briefs, limited to issues raised in case briefs. The Department will consider rebuttal briefs filed not later than five days after the time limit for filing case briefs. Parties who submit arguments are requested to submit with each argument (1) a statement of the issue, (2) a brief summary of the argument, and (3) a table of authorities. Further, we request that parties submitting written comments provide the Department with a diskette containing the public version of those comments. Unless the deadline is extended pursuant to section 751(a)(3)(A) of the Act, the Department will issue the final results of this administrative review, including the results of our analysis of the issues raised by the parties in their comments, within 120 days of publication of the preliminary results. The assessment of antidumping duties on entries of merchandise covered by this review and future deposits of estimated duties shall be based on the final results of this review.

**Notification to Importers**

This notice also serves as a preliminary reminder to importers of their responsibility under 19 C.F.R. § 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

We are issuing and publishing this notice in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: August 1, 2005.

Joseph A. Spetrini,

*Acting Assistant Secretary for Import Administration.*

[FR Doc. E5–4306 Filed 8–8–05; 8:45 am]

**(Billing Code: 3510–DS–S)**

## DEPARTMENT OF COMMERCE

### National Institute of Standards and Technology

#### Notice of Workshop To Participate in the Development of Software Assurance Metrics

**AGENCY:** National Institute of Standards and Technology, Commerce.

**ACTION:** Notice of workshop.

**SUMMARY:** The National Institute of Standards and Technology (NIST) announces the first in a series of planned workshops being held in support of NIST's Software Assurance Metrics and Tool Evaluation (SAMATE) project. NIST is working with industry, academia, and users:

• To identify deficiencies in software assurance (SA) methods and tools.

• To develop metrics for the effectiveness of SA tools.

NIST invites parties interested in these issues to contribute to the specification of such metrics and to the development of reference data sets capable of testing the effectiveness of SA tools. These reference data sets, when used during an SA tool's development, can aid in building a correct implementation with regard to these metrics.

The first workshop "Defining the State of the Art in Software Security Tools" is being held at NIST Gaithersburg August 10 and 11. Future Workshops will be announced on the Project's Web site *http://samate.nist.gov/* and on other SA forums.

**DATES:** The first workshop is being held at NIST Gaithersburg August 10, 9 a.m. to 5 p.m. and August 11, 2005, 9 a.m. to 1 p.m.

**FOR FURTHER INFORMATION CONTACT:** For further information, you may visit the Software Assurance Metrics Project Website at *http://samate.nist.gov/.* In addition, you may telephone Dr. Paul E. Black at (301) 975–4794, or by e-mail at: *paul.black@nist.gov.*

**SUPPLEMENTARY INFORMATION:** In support of its Software Assurance Metrics and Tool Evaluation (SAMATE) project, NIST is working with industry, academia, and users:

• To identify deficiencies in software assurance (SA) methods and tools.

• To develop metrics for the effectiveness of SA tools.

The SA Metrics Project surveys current SA tools and develops a classification scheme, grouping SA tools with similar functionality or capability. A set of metrics and tests are developed for each tool class. Source/object code vulnerability scanners are an example of one possible class. A series of Workshops will be used to:

• Validate the tool classes.

• Establish priorities for the order in which SA tool classes are tested.

• Help determine the required and optional functionality for each class of SA tools.

After a tool class is selected, requirements, metrics, and tests for these functionalities are developed. Classification and testing activities can proceed simultaneously. As a result, a draft specification and test methodology for the highest priority tool class is developed. Further information on the project, including the Project Plan, may be found at the Project's Web site *http://samate.nist.gov/* and on other SA forums.

Dated: August 3, 2005.

Matthew Heyman,

*Chief of Staff.*

[FR Doc. 05–15724 Filed 8–8–05; 8:45 am]

**BILLING CODE 3510–13–P**

## CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

### Information Collection; Submission for OMB Emergency Review, Comment Request

**AGENCY:** Corporation for National and Community Service.

**ACTION:** Notice.

**SUMMARY:** The Corporation for National and Community Service (hereinafter the "Corporation"), has submitted a public information collection request (ICR) entitled AmeriCorps Application Instructions: State Competitive, State Education Award, National Direct, National Direct Education Award, National Professional Corps, Indian Tribes, States and Territories without Commissions, and National Planning, to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995, Pub. L. 104–13, (44 U.S.C. Chapter 35). A copy of this ICR, with applicable supporting documentation, may be obtained by contacting the Corporation for National and Community Service, AmeriCorps, Amy Borgstrom, Associate Director of

Policy, (202) 606–6930, or by e-mail at *ABorgstrom@cns.gov.* Individuals who use a telecommunications device for the deaf (TTY–TDD) may call (202) 565–2799 between 8:30 a.m. and 5 p.m. eastern time, Monday through Friday.

**ADDRESSES:** Comments may be submitted, identified by the title of the information collection activity, to (1) Corporation for National and Community Service, and (2) the Office of Information and Regulatory Affairs. Please send comments to:

1. Corporation for National and Community Service, Attn: Amy Borgstrom, Associate Director of Policy for AmeriCorps, by any of the following two methods within 30 days from the date of publication in this **Federal Register:**

(a) By fax to: (202) 606–3476, Attention: Amy Borgstrom, Associate Director of Policy for AmeriCorps; and

(b) Electronically by e-mail to: *ABorgstrom@cns.gov;* and

2. Office of Information and Regulatory Affairs, Attn: Ms. Katherine Astrich, OMB Desk Officer for the Corporation for National and Community Service, by any of the following two methods within 30 days from the date of publication in this **Federal Register:**

(a) By fax to: (202) 395–6974, Attention: Ms. Katherine Astrich, OMB Desk Officer for the Corporation for National and Community Service; and

(b) Electronically by e-mail to: *Katherine_T_Astrich@omb.eop.gov.*

**SUPPLEMENTARY INFORMATION:** The OMB is particularly interested in comments which:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the Corporation, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

• Propose ways to enhance the quality, utility, and clarity of the information to be collected; and

• Propose ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submissions of responses.

**Comments**

*Description:* Since the President's Call to Service, many Americans have

# EXHIBIT 4

# SHEARMAN & STERLING LLP



FAX: 202 508-8100
WWW SHEARMAN COM

801 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C 20004-2604
202 508 8000

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SÃO PAULO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C

WRITER'S DIRECT NUMBER:
202 508 8035

WRITER'S EMAIL ADDRESS:
robert.larussa@stearman.com

April 21, 2004

---
Case No. A-423-808
Total Pages: 9
Administrative Review for the
  Period 5/1/02 to 4/30/03
Group III, Office 7
PUBLIC DOCUMENT
---

BY HAND
The Honorable Donald L. Evans
Secretary of Commerce
Attention:  Import Administration
Central Records Unit, Room 1870
U.S. Department of Commerce
Pennsylvania Avenue & 15th Street, N.W.
Washington, D.C.  20230

Re:    Administrative Review of the Antidumping Order on Stainless
       Steel Plate in Coils from Belgium for the 2002-2003 Review Period

Dear Secretary Evans:

We are writing on behalf of our client, Ugine and ALZ Belgium ("U&A Belgium") to

request a meeting with the Department of Commerce ("the Department") to discuss the potential

inclusion of German-origin stainless steel plate in coil ("SSPC") in the administrative review of

SSPC from Belgium.  The inclusion of such material in the Department's margin calculation

Shearman & Sterling LLP is a limited liability partnership organized in the United States under
the laws of the State of Delaware, which laws limit the personal liability of partners.

The Honorable Donald L. Evans
April 21, 2004
Page 2

would not only violate the express provisions of the antidumping statute, but would also run

directly counter to well-established Department precedent.

Accordingly, U&A Belgium respectfully requests an opportunity to meet with the

Department as soon as possible to address and clarify any concerns the Department may have

about determining that German-origin SSPC is outside the scope of the administrative review of

Belgian SSPC. For the Department's reference, U&A Belgium's specific concerns and legal

arguments supporting this treatment are set forth below.

I.    THE SALES AT ISSUE INVOLVE GERMAN-ORIGIN SSPC AND CANNOT BE INCLUDED
      IN THE BELGIAN REVIEW

The Department has clearly established that hot rolling constitutes a substantial

transformation for purposes of establishing country of origin under the dumping laws.[1]  Because

it is hot rolled in Germany, the merchandise at issue in this review is legally German in origin,

and therefore, is not subject to a review of Belgian SSPC.[2]  Accordingly, the Department should

not use sales of such merchandise in its preliminary and final margin calculation.

---

[1]  *See, e.g., Notice of Final Determination of Sales at Less than Fair Value: Wax and Wax Resin Thermal Transfer Ribbon from the Republic of Korea,* 69 Fed. Reg. 17,645, 17,647 (April 5, 2004) ("the Department has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different "classes or kinds" of merchandise: (*see, e.g., steel slabs converted to hot-rolled band....*)"); *Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France,* 69 Fed. Reg. 10674, 10675 (March 8, 2004) (same quote as above); *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet & Strip from the United Kingdom,* 64 Fed. Reg. 30,688, 30,703-04 (June 9, 1999) ("As we found in the Stainless Steel Plate from Sweden Scope Memorandum, based upon physical changes that the conversion of slab into hot band produces on the product, we conclude that the rolling of slabs into hot bands results in the production of a "new and different article" and constitutes a substantial transformation within the meaning of the antidumping law."); *Notice of Preliminary Determination of Sales at Less than Fair Value: Stainless Steel Bar from Italy,* 66 Fed. Reg. 40214 (August 2, 2001) ; *Memorandum from Richard Weible to Joseph Spetrini re: Affirmative Scope Ruling--Stainless Steel Plate from Sweden (A-401-040),* December 22, 1997.

[2]  As a matter of law, German-origin SSPC cannot be included in the review of SSPC from Belgium. It is well settled that antidumping investigations and reviews are conducted on a country-specific basis. Subject merchandise, by definition, must originate in the country under review. *See, e.g., Slater Steel Corp. v. United States,* 297 F. Supp. 2d 1362, 1365 (Ct. Int'l Trade 2003) ("The dumping margin is the amount that the normal value of the foreign like product subject to the antidumping proceeding exceeds the export price of the subject merchandise. 19 U.S.C. § 1673. The foreign like product is restricted, under any of its definitions in 19 U.S.C. § 1677(16), to identical or

The Honorable Donald L. Evans
April 21, 2004
Page 3

As the Department is aware, U&A Belgium does not have the capacity to hot roll slab.

Accordingly, during the review period U&A Belgium contracted with affiliated hot rollers in

Belgium and Germany to roll its slab into SSPC. The SSPC was then returned to U&A Belgium

where it was pickled, annealed, and sold.[3] The Department considered facts virtually identical to

those presented in this review in *Stainless Steel Sheet and Strip in Coils from the UK* ("*Stainless*

*Steel Sheet and Strip*"):

- Avesta Sheffield, a UK company, produced slab in the United Kingdom.

- A portion of that slab was hot rolled in Sweden by an affiliated processor before

  being returned to the United Kingdom for pickling and annealing before sale.[4]

In that case, the Department expressly determined that slab hot rolled in Sweden was excluded

from the scope of the review on UK stainless steel sheet and strip because hot rolling constitutes

a substantial transformation.[5] According to the Department, such slab was of Swedish origin and

outside the scope of the review.[6]

---

similar merchandise that is produced in the *same country* as the subject merchandise.... "Normal value" is defined
in 19 U.S.C. § 1677b(a)(1)(B) as home market sales of the foreign like product, third country sales of the foreign
like product, or constructed value of the subject merchandise. Under any of these definitions, both the "foreign like
product" and the "subject merchandise" must be in the same country as the merchandise that is the subject of the
investigation. Congress has further defined a country in antidumping duty proceedings to be "a foreign country", a
political subdivision, dependent territory, or possession of a foreign country. This definition does not allow for more than
two foreign countries to be counted as one, especially in the instance of antidumping duty proceedings. 19 U.S.C. §
1677(3)."). (emphasis in original).

[3] A portion of the SSPC that was hot rolled in Germany was subsequently cold rolled in Belgium. Because cold
rolling arguably constitutes substantial transformation, U&A Belgium reported sales of such merchandise in its
home-market and U.S. sales listings.

[4] 64 Fed. Reg. 30,688, 30,703-04 (June 9, 1999).

[5] *See id.* ("The processing of slabs into hot bands dramatically changes the physical characteristics of the product,
drastically reducing the thickness, extending its length, changing the microstructure and significantly increasing its
strength characteristics. Therefore, we find that U.K. slabs hot rolled in Sweden do not fall within the scope of this
investigation. Accordingly, we are continuing to exclude hot-rolled sales in our final analysis.").

[6] *See id.*

The Honorable Donald L. Evans
April 21, 2004
Page 4

The parallels between the two cases clearly dictate the same result. In both cases, slab

from the country under review was substantially transformed by an affiliate through a tolling

arrangement in another country into hot-rolled coils and shipped back to the country under

review for minor processing (*i.e.*, pickling and annealing).[7] In addition, aside from differences in

thickness and width, the scope of the subject merchandise in the two cases is identical:

| Scope of the Current Review of SSPC from Belgium | Scope of the Stainless Steel Sheet and Strip Review |
|---|---|
| For purposes of this review, the product covered is stainless steel plate in coils. Stainless steel is an alloy steel containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements. The subject plate products are flat-rolled products, 254 mm or over in width and 4.75 mm or more in thickness, in coils, and annealed or otherwise heat treated and pickled or otherwise descaled. The subject plate may be further processed... provided that it maintains the specified dimensions of plate following such processing. | For purposes of this investigation, the products covered are certain stainless steel sheet and strip in coils. Stainless steel is an alloy steel containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements. The subject sheet and strip is a flat-rolled product in coils that is greater than 9.5 mm in width and less than 4.75 mm in thickness, and that is annealed or otherwise heat treated and pickled or otherwise descaled. The subject sheet may be further processed... provided that it maintains the specific dimensions of sheet and strip following such processing. |

---

[7] It is of note that the Department has expressly defined pickling and annealing as "minor processing" that "does not result in a substantial transformation or a change in the country of origin of the product that is processed." *See Suspension of Antidumping Duty Investigation: Hot-Rolled Flat-Rolled Carbon- Quality Steel Products From the Russian Federation*, 64 Fed. Reg. 38642 (July 14, 1999); *Notice of Proposed Agreement Regarding Certain Steel Products from the Russian Federation*, 64 Fed. Reg. 9892, 9893 (February 26, 1999). *See also, Notice of Final Determination of Sales at Less than Fair Value: Wax and Wax Resin Thermal Transfer Ribbon from the Republic of Korea*, 69 Fed. Reg. 17,645, 17,647 (April 5, 2004) ("the Department almost invariably determines substantial transformation has not taken place when both products are within the same "class or kind" of merchandise: (*see, e.g...* hot-rolled coils pickled and trimmed....."); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products From the People's Republic of China*, 66 Fed. Reg. 22183, 22186 (May 3, 2001) ("In this case, the manufacturing process undertaken by Yi Chang in the PRC did not result in a change in the class or kind of merchandise between the third country hot-rolled steel coils and Yi Chang's pickled hot-rolled steel coils. In addition, although Yi Chang does perform some processing on the imported hot-rolled coils (*i.e.*, trimming and pickling), that further processing does not result in a substantial transformation within the context of this antidumping investigation.").

The Honorable Donald L. Evans
April 21, 2004
Page 5

Accordingly, in this review, U&A Belgium determined that slab hot rolled into SSPC in

Belgium is of Belgian origin and within the scope of review. U&A Belgium reported sales of

this material in its questionnaire responses. Given the Department's precedent, U&A Belgium,

however, properly did not report sales of SSPC that had been hot-rolled in Germany and later

pickled and annealed in Belgium.[8] Such material is of German origin and, therefore, outside the

scope of this review.

II.    ISSUES OF TOLLING AND AFFILIATION
       HAVE NO BEARING ON COUNTRY OF ORIGIN

We have examined the issues raised in the Petitioners' December 15, 2003 comments on

U&A Belgium's Sections A through C responses and are concerned that there may be confusion

over the fact that the material at issue was transformed from slab into SSPC by a German

affiliate of U&A Belgium through a tolling arrangement. In those comments, the Petitioners

claimed that the SSPC at issue is not German in origin because the hot rolling was performed on

a tolling basis by an affiliate of U&A Belgium. According to the Petitioners, the SSPC is not of

German origin because the affiliated toller does not become the "producer" of the material under

the Department's tolling regulations. Petitioners' comments are without merit.

As discussed above, the facts in *Stainless Steel Sheet and Strip* are virtually identical to

the facts of the current review. In both cases, slab is transformed into hot rolled material by a

foreign affiliate of the producer through a tolling arrangement. At no point in the *Stainless Steel*

*Sheet and Strip* case did the Department indicate that the affiliation between Avesta's UK and

Swedish facilities and/or the fact that the slab was toll processed affected its "substantial

---

[8]  At the Department's request, however, U&A Belgium did report sales of the German-origin product on April 2, 2004.

The Honorable Donald L. Evans
April 21, 2004
Page 6

transformation" analysis. Rather, the Department focused solely on whether the processing that

occurred in Sweden materially altered the physical or chemical characteristics of the slab, or

contributed substantially to the economic value of the final product. As discussed, the

Department has clearly stated that hot rolling constituted a substantial transformation for

purposes of establishing the country of origin. At the same time, by not including the

merchandise within the scope of the investigation, the Department rejected the notion that

pickling and annealing in the UK was sufficient to constitute a second substantial transformation.

The Department has also considered in other contexts whether a product can be

substantially transformed for purposes of determining its country of origin through a

tolling process. In *Polyvinyl Alcohol from Taiwan*, E.I. Dupont de Nemours & Company

("Dupont") manufactured vinyl acetate monomer ("VAM") in the United States. Dupont

then shipped this VAM to a toller in Taiwan (Chang Chun) that performed a chemical

process in which the VAM was polymerized into polyvinyl acetate. The polyvinyl

acetate was then converted into PVA through a second chemical process performed by

Chang Chun. The PVA was then shipped back to DuPont for sale by DuPont to

customers in the United States and elsewhere.[9] DuPont requested a scope ruling on this

merchandise arguing that "PVA toll-produced in Taiwan from DuPont's U.S.-origin raw

materials" is not within the scope of the antidumping duty order.[10]

The Department rejected DuPont's argument and denied its request for a formal scope

inquiry. The Department stated that a formal scope inquiry was not required because the

---

[9] *See* E.I. DuPont de Nemours & Co. v. United States, 8 F. Supp. 854, 856 (Ct. Int'l Trade 1998).

[10] *Id.*

The Honorable Donald L. Evans
April 21, 2004
Page 7

material would be in the scope of the antidumping order unless the Department determined that

the chemical processes performed by Chang Chun did not constitute a substantial

transformation.[11]  The fact that the merchandise was processed through a tolling relationship was

not relevant to the issue of whether a substantial transformation occurred.  Ultimately, the

Department determined that the chemical processes *did* constitute a substantial transformation

and, therefore, determined that the material was Taiwanese in origin and within the scope of the

review.[12]

DuPont appealed the issue to the U.S. Court of International Trade, which upheld the

Department's determination.[13]  The Court held that the use of the "substantial transformation"

test to determine a product's country of origin was not only a reasonable interpretation of the

antidumping statute, but also provided a concrete "standard by which the Court "can understand

the basis of the agency's action and so may review Commerce's exercise of its statutory

responsibilities."[14]  Under these circumstances, it is clear that the tolling relationship between

U&A Belgium and its German affiliate is not relevant to the country of origin issue.[15]

---

[11]  *See Final Scope Ruling on Antidumping Duty Order on Polyvinyl Alcohol from Taiwan*, December 19, 1996).

[12]  *See id.* at 3.

[13]  *See E.I. DuPont de Nemours & Co. v. United States*, 25 F. Supp. 365 (Ct. Int'l Trade 1998) (affirming Commerce's remand determination).

[14]  *Dupont*, 8 F. Supp. 2d at 859.

[15]  The Department's tolling regulation does not apply to country of origin issues but is focused instead on determining the proper respondent in a proceeding.  19 C.F.R. § 351.401(h) provides, "The Secretary will not consider a toller or subcontractor to be a manufacturer or producer where the toller or subcontractor does not acquire ownership, and does not control the relevant sale, of the subject merchandise or foreign like product."

The Honorable Donald L. Evans
April 21, 2004
Page 8

Furthermore, the Department has explicitly addressed the question of the relationship of

tolling to country of origin. In a memorandum adopting a change to the tolling methodology,[16]

the Department said:

> Moreover, for purposes of determining dumping under section 731 of the Act, the
> Department should distinguish, where appropriate, between the site of production
> and the location of the person or entity responsible for production, i.e., the
> "producer." The site of production of the subject merchandise has the legal
> significance of determining the scope of the order and the country in which FMV
> must be determined. However the location of the producer has no such
> significance. Tolling cases often represent situations in which such a distinction
> is relevant, as the owner and seller of the merchandise may be located in a country
> other than that in which the tolling takes place.[17] (Footnotes omitted.)

And further:

> Where tolling has resulted in a substantial transformation, and the merchandise
> resulting from that transformation is subject to an order against the toller's
> country, we should maintain our current practice of considering that merchandise
> a product of the toller's country.[18]

Under these circumstances, the tolling question is one that must be answered to decide

who is the producer of the merchandise and which transactions are relevant to the calculation of

any margin of dumping, but not to determine the country of origin of the merchandise.[19]

---

[16] *See Memorandum from Joseph A. Spetrini, Deputy Assistant Secretary for Compliance, to Susan G. Esserman,
Assistant Secretary for Import Administration, Discussion Memorandum: A Proposed Alternative to Current
Tolling Methodology in the Current Antidumping (AD) Reviews of Carbon Steel Flat Products*, December 12, 1994.

[17] *Id.* at 2.

[18] *Id.* at 7.

[19] The Department's precedent further supports this conclusion. *See, e.g., Notice of Final Determination of Sales at
Less Than Fair Value: Low Enriched Uranium From France*, 66 Fed. Reg. 65,877, 65883 (December 21, 2000) ("In
establishing general rules for calculating EP, CEP and NV, we promulgated section 351.401(h) of our regulations to
address the treatment of subcontractors and tolling operations under the AD law. The purpose of the regulation is to
enable the Department to identify the appropriate seller of subject merchandise and foreign like product for purposes
of calculating EP, CEP and NV.").

The Honorable Donald L. Evans
April 21, 2004
Page 9

Country of origin is solely dependent on where the merchandise is physically produced (and if

relevant, substantially transformed).[20]

\*   \*   \*

The Department has clearly established that hot rolling constitutes a substantial

transformation for purposes of establishing country of origin under the dumping laws. Nothing

in the Department's prior practice suggests that this rule does not apply when the hot rolling is

performed by an affiliated party or through a tolling relationship. Accordingly, affiliation and

tolling relationship between U&A Belgium and the affiliated toller in this review are also

irrelevant. Because they are of German origin, these products are properly outside the scope of

this review and should not be used in the Department's dumping margin calculation. Any other

result would be unsupported by substantial evidence and otherwise not in accordance with law.

We look forward to meeting with the Department to discuss these issues further. Please

do not hesitate to contact us if you have any questions.

Respectfully submitted,

Robert S. LaRussa
Christopher M. Ryan

---

[20] *See Memorandum from Joseph A. Spetrini, Deputy Assistant Secretary for Compliance, to Susan G. Esserman, Assistant Secretary for Import Administration, Discussion Memorandum: A Proposed Alternative to Current Tolling Methodology in the Current Antidumping (AD) Reviews of Carbon Steel Flat Products* at 7 ("[T]he choice of respondent would be based on the party which controls the sale of the subject merchandise, including U.S. parties which subcontract part of the production process in a foreign country. However, the country of origin, and thus the basis of U.S. price and FMV, would depend upon whether the tolling resulted in substantial transformation.").

*Stainless Steel Plate in Coils from Belgium*
*DOC: A-423-808*
*POR: 5/01/02 – 4/30/03*

## U.S. DEPARTMENT OF COMMERCE
## Public Certificate of Service

This is to certify that a copy of the foregoing submission is being served April 21, 2004

via hand delivery on the following party:

Adam Gordon, Esq. &
Jeffrey Beckington, Esq.
Collier, Shannon, Rill & Scott PLLC
3050 K Street, N.W.
Washington, D.C.  20007-5108

_____
Robert LaRussa

# EXHIBIT 5
# PART 1

No. 05-1550

In The

# United States Court of Appeals
### For The Federal Circuit

## UGINE AND ALZ BELGIUM, ARCELOR STAINLESS USA, LLC, and ARCELOR TRADING USA, LLC,

*Plaintiffs-Appellants,*

v.

## UNITED STATES,

*Defendant-Appellee,*

and

## ALLEGHENY LUDLUM, AK STEEL CORP., BUTLER ARMCO INDEPENDENT UNION, UNITED STEELWORKERS OF AMERICA, AFL-CIO/CLC, and ZANESVILLE ARMCO INDEPENDENT ORGANIZATION,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE
IN CONSOLIDATED CASE NO. 05-00444,
SENIOR JUDGE THOMAS J. AQUILINO, JR.

_____

## BRIEF OF APPELLANTS

_____

Stephen J. Marzen
Robert S. LaRussa
Wendy E. Ackerman
Jonathan R. DeFosse
Ryan A. Trapani
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20004
(202) 508-8000

*Date of Brief: October 31, 2005*                    *Counsel for Appellants*

THE LEX GROUP^DC ♦ 1750 K Street, NW ♦ Suite 475 ♦ Washington, DC 20006
(202) 955-0001 ♦ (800) 815-3791 ♦ Fax: (202) 955-0022 ♦ www.thelexgroupdc.com

### CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4:

(1) The full name of every party or amicus represented in the case by the attorney: Plaintiffs-Appellants Ugine and ALZ Belgium, Arcelor Stainless USA, LLC, and Arcelor Trading USA, LLC.

(2) The name of the real party in interest if the party named in the caption is not the real party in interest: The Plaintiffs-Appellants named in the caption are the real parties in interest.

(3) The corporate disclosure statement prescribed in Federal Rule of Appellate Procedure 26.1: Arcelor S.A. is the ultimate parent corporation of Plaintiffs-Appellants Ugine and ALZ Belgium, Arcelor Stainless USA, LLC, and Arcelor Trading USA, LLC. Arcelor S.A. directly or indirectly owns 100% of the equity in each subsidiary. Shares of Arcelor S.A. are listed on the Luxembourg Stock Exchange, the Premier Marché of Euronext Brussels, the Premier Marché of Euronext Paris, and the stock exchanges of Madrid, Barcelona, Bilbao, and Valencia. An ADR (American Depositary Receipt) 144A program is active in the United States since March 15, 2004, with Bank of New York acting as depository.

(4) The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the

party in this court: Shearman & Sterling LLP, by Stephen J. Marzen, Robert S.

LaRussa, Wendy E. Ackerman, Jonathan R. DeFosse, and Ryan A. T. Trapani.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ..................................................................... vi

STATEMENT OF RELATED CASES ........................................................ 1

STATEMENT OF JURISDICTION ............................................................ 2

ISSUES PRESENTED .............................................................................. 2

PRELIMINARY STATEMENT.................................................................. 4

STATEMENT OF THE CASE ................................................................... 7

STATEMENT OF FACTS.......................................................................... 9

    A.    Commerce Issued Anti-Dumping and Countervailing Duty
           Orders on SSPC from Belgium ................................................ 9

    B.    Arcelor Mistakenly Declared Belgium as the Country of Origin
           of German Hot-Rolled SSPC ................................................ 10

    C.    Arcelor Filed Timely Protests with Customs to Correct Its
           Designation of German Hot-Rolled SSPC as Belgian and
           Obtain Refunds of Its Cash Deposits .................................... 10

    D.    Commerce Issued Liquidation Instructions Ordering Customs
           to Assess Antidumping and Countervailing Duties Applicable
           to Belgian SSPC on Arcelor's German Hot-Rolled SSPC................ 11

    E.    The CIT Refused to Enter a Preliminary Injunction to Stay
           Liquidation........................................................................ 13

SUMMARY OF ARGUMENT ............................................................................. 15

STANDARD OF REVIEW .................................................................................. 18

ARGUMENT ....................................................................................................... 19

I.    THE CIT ABUSED ITS DISCRETION WHEN IT REFUSED TO GRANT
      A PRELIMINARY INJUNCTION BASED ON THE PARTIES' CONSENT ....... 19

II.   THE CIT ABUSED ITS DISCRETION IN HOLDING THAT ARCELOR
      FAILED TO SATISFY THE TRADITIONAL FOUR-FACTOR TEST FOR A
      PRELIMINARY INJUNCTION .............................................................. 22

      A.   Assuming that Arcelor Has No Right to Protest
           Commerce's Liquidation Instructions Before Customs, It
           Will Suffer Irreparable Injury in the Absence of an
           Injunction ..................................................................... 24

      B.   Arcelor Has a Strong Likelihood of Establishing that
           Commerce's July 8 and 18, 2005 Liquidation Instructions
           Were Arbitrary, Capricious, and Contrary to Law ................. 27

           1.   Under Long-Standing Practice, SSPC Hot Rolled
                in Germany and Not Further Cold Rolled in
                Belgium Originated in Germany, Not Belgium ............. 29

           2.   Commerce Failed to Provide a Reasoned
                Explanation for Instructing Customs to Liquidate
                German Hot-Rolled SSPC at the Duty Rate
                Applicable to Belgian SSPC ..................................... 30

           3.   Commerce's Instructions Cannot Be Justified on
                Grounds of Administrative Finality ............................. 32

      C.   The Balance of Hardships Weighs in Favor of a
           Preliminary Injunction .......................................................... 35

      D.   The Public Interest Will Be Served by Preserving the
           Status Quo ......................................................................... 36

CONCLUSION ....................................................................................... 37

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airmark Corp. v. FAA,*
    758 F.2d 685 (D.C. Cir. 1985) ................................................................. 31

*Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund,*
    902 F.2d 185 (2d Cir. 1990) ................................................................. 19

*Asociacion Colombiana de Exportadores de Flores v. United States,*
    916 F.2d 1571 (Fed. Cir. 1990) ................................................................. 25

*Bano v. Union Carbide Corp.,*
    273 F.3d 120 (2d Cir. 2001) ................................................................. 19

*Bradley v. Chiron Corp.,*
    136 F.3d 1317 (Fed. Cir. 1998) ................................................................. 19

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ................................................................. 30

*C.J. Tower & Sons of Niagara, Inc. v. United States,*
    70 Cust. Ct. 1 (Cust. Ct. 1973) ................................................................. 34

*Ceramica Regiomontana, S.A. v. United States,*
    590 F. Supp. 1260 (C.I.T. 1984) ................................................................. 36

*Chrysler Corp. v. United States,*
    87 F. Supp. 2d 1339 (C.I.T. 2000) ................................................................. 34

*Consol. Bearings Co. v. United States,*
    348 F.3d 997 (Fed. Cir. 2003) ................................................................. 27

*Fed. Sav. & Loan Ins. Corp. v. Blain,*
    808 F.2d 395 (5th Cir. 1987) ................................................................. 21

*Federal-Mogul Corp. v. United States,*
    808 F. Supp. 839 (C.I.T. 1992)........................................................................ 22

*Ferrostal Metals Corp. v. United States,*
    664 F. Supp. 535 (C.I.T. 1987)........................................................................ 34

*FMC Corp. v. United States,*
    3 F.3d 424 (Fed. Cir. 1993) ............................................................................ 23

*Foster v. Hallco Mfg. Co.,*
    947 F.2d 469 (Fed. Cir. 1991) ........................................................................ 19

*FTC v. Standard Financial Mgt. Corp.,*
    830 F.2d 404 (1st Cir. 1987)........................................................................... 20

*Hilton v. Braunskill,*
    481 U.S. 770 (1987)......................................................................................... 23

*Integraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999) ...................................................................... 18

*J.S. Stone Inc. v. United States,*
    297 F. Supp. 2d 1333 (C.I.T. 2003)................................................................ 26

*Jinfu Trading Co. v. United States,*
    No. 04-00597, 2005 WL 226174 (C.I.T. Jan. 31, 2005) ................................ 22

*Laclede Steel Co. v. United States,*
    928 F. Supp. 1182 (C.I.T. 1996)..................................................................... 24

*Local No. 93, Int'l Ass'n of Firefighters v. Cleveland,*
    478 U.S. 501 (1986)......................................................................................... 20

*Mitsubishi Elecs. America, Inc. v. United States,*
    44 F.3d 973 (Fed. Cir. 1994) .................................................................... 11, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.,*
    463 U.S. 29 (1983)........................................................................................... 30

*Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004) ................................................................... 18

*National Helicopter Corp. of America v. City of New York,*
    137 F.3d 81 (2d Cir. 1998) ........................................................................... 21

*NMB Singapore Ltd. v. United States*,
    120 F. Supp. 2d 1135 (C.I.T. 2000).............................................................. 24

*PAM S.p.A. v. United States*,
    347 F. Supp. 2d 1362 (C.I.T. 2004).............................................................. 22

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)...................................................................................... 30

*PPG Indus., Inc. v. United States*,
    11 CIT 5 (1987) ............................................................................................ 36

*Public Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993)...................................................................... 30

*Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*,
    350 F.3d 1235 (Fed. Cir. 2003) ................................................................... 18

*Roe v. Operation Rescue*,
    919 F.2d 857 (3d Cir. 1990) ........................................................................ 21

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)...................................................................................... 30

*SEC v. Randolph*,
    736 F.2d 525 (9th Cir. 1984) ....................................................................... 20

*SEC v. Wang*,
    944 F.2d 80 (2d Cir. 1991) ........................................................................... 19

*Shinyei Corp. of Am. v. United States*,
    355 F.3d 1297 (Fed. Cir. 2004) ................................................................... 25

*Sierra Club v. Babbitt,*
    65 F.3d 1502 (9th Cir. 1995) ......................................................... 21

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ................................................... 30

*SKF USA Inc., v. United States,*
    316 F. Supp. 2d 1322 (C.I.T. 2004)................................... 24, 28, 35

*Stovall v. City of Cocoa,*
    117 F.3d 1238 (11th Cir. 1997) ............................................... 20, 21

*U.S. Ass'n of Importers of Textiles & Apparel v. United States,*
    413 F.3d 1344 (Fed. Cir. 2005) ............................................. 18, 23

*Ugine-Savoie Imphy v. United States,*
    121 F. Supp. 2d 684 (C.I.T. 2000)................................... 27, 28, 36

*United States v. Cannons Eng'g Corp.*
    720 F. Supp. 1027 (D. Mass. 1989).............................................. 20

*United States v. Cherry Hill Textiles,*
    112 F.3d 1550 (Fed. Cir. 1997) ................................................... 34

*United States v. FAG Bearings Corp.,*
    615 F. Supp. 562 (C.I.T. 1984)................................................... 35

*United States v. Golden Ship Trading Co.,*
    25 CIT 40 (2001) ........................................................................ 34

*United States v. Utex Int'l, Inc.,*
    857 F.2d 1408 (Fed. Cir. 1988) ................................................... 33

*Xerox Corp. v. United States,*
    289 F.3d 792 (Fed. Cir. 2002) ............................................. *passim*

*Zenith Radio Corp. v. United States,*
    710 F.2d 806 (Fed. Cir. 1983) ......................................... 23, 24, 25

**STATUTES**

5 U.S.C. § 706(2) ................................................................................................ 7

5 U.S.C. § 706(2)(A) .......................................................................................... 28

19 U.S.C. § 1481 ................................................................................................ 34

19 U.S.C. § 1484 ................................................................................................ 34

19 U.S.C. § 1514 ................................................................................... 10, 33, 34

19 U.S.C. § 1514(a) ..................................................................................... 25, 33

19 U.S.C. § 1514(a)(2) ................................................................................. 16, 26

19 U.S.C. § 1514(c)(3) ....................................................................................... 33

19 U.S.C. § 1515 ................................................................................................ 25

19 U.S.C. § 1515(a) ........................................................................................... 33

19 U.S.C. § 1516a .............................................................................................. 25

19 U.S.C. § 1520 ................................................................................................ 34

19 U.S.C. § 1592 ................................................................................................ 34

19 U.S.C. § 1675 ................................................................................................ 11

19 U.S.C. § 1675(c) ............................................................................................. 4

28 U.S.C. § 1292(c)(1) ......................................................................................... 2

28 U.S.C. § 1295(a)(5) ....................................................................................... 33

28 U.S.C. § 1581 ................................................................................................ 27

28 U.S.C. § 1581(a) ................................................................................. 26, 27, 33

28 U.S.C. § 1581(i) ........................................................................... 15, 27

28 U.S.C. § 1581(i)(4) ............................................................................. 2

28 U.S.C. § 1581(4) ................................................................................ 2

28 U.S.C. § 2640 .................................................................................... 7

**RULE**

Fed. Cir. R. 47.5 ................................................................................... 1

**REGULATIONS**

19 C.F.R. § 134.0 *et seq.* ....................................................................... 34

19 C.F.R. § 141.85 ............................................................................... 34

19 C.F.R. § 141.86(a)(10) ...................................................................... 33

19 C.F.R. § 142.3 ................................................................................. 33

19 C.F.R. § 173.1 ................................................................................. 10

19 C.F.R. § 173.2 ................................................................................. 10

19 C.F.R. § 173.2(a) ............................................................................. 35

19 C.F.R. § 177.22 ............................................................................... 34

19 C.F.R. § 351.212(c)(1) ...................................................................... 11

**OTHER AUTHORITIES**

Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan Investigation Nos. 701-TA-376, 377, and 379 (Final), and Investigation Nos. 731-TA-788-793 (Final), USITC Pub. 3188 (May 1999) ................................................................................................... 9

Final Affirmative Countervailing Duty Determination; Stainless Steel Plate
in Coils From Belgium, 64 Fed. Reg. 15567 (March 31, 1999)................................ 9

Final Determination of Sales at Less Than Fair Value; Stainless Steel Plate
in Coils from Belgium, 64 Fed. Reg. 15476 (March 31, 1999)................................ 9

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Counsel for Plaintiffs-Appellants

Ugine and ALZ Belgium, Arcelor Stainless USA, LLC, and Arcelor Trading USA,

LLC, states as follows:

1.    No other appeal from the same civil action in the United States Court

of International Trade was previously before this or any other appellate court.

2.    The Court's decision of this appeal will directly affect the civil action

from which this appeal has been taken – namely, *Ugine & ALZ Belgium, N.V., v.*

*United States*, No. 05-00444. That action is pending before the United States Court

of International Trade. Counsel knows of no other pending case that will directly

affect or be directly affected by this Court's decision.

1

## STATEMENT OF JURISDICTION

Plaintiffs-Appellants Ugine & ALZ Belgium, Arcelor Stainless USA, LLC, and Arcelor Trading USA, LLC's (collectively, "Arcelor") brought this action under 28 U.S.C. § 1581(i)(2) and (4), which vest the Court of International Trade ("CIT") with jurisdiction over actions that arise out of the laws of the United States relating to duties on the importation of merchandise and the administration and enforcement of those laws. As explained below, *infra*, pp. 22-24, the CIT's orders raise a question as to whether it had jurisdiction over this action. If the CIT had jurisdiction, this Court has jurisdiction under 28 U.S.C. § 1292(c)(1), because the appealed orders are interlocutory orders refusing a preliminary injunction. If the CIT did not have jurisdiction, then this Court has jurisdiction only to vacate the CIT's orders and remand with instructions to dismiss this action for want of jurisdiction.

The CIT's orders were entered on August 17 and 29, 2005. Addendum ("Add.") 20, 29; Joint Appendix ("J.A.") 5-6, 27, 36. The notice of appeal was timely filed on August 31, 2005. J.A. 37.

## ISSUES PRESENTED

1.    Whether the CIT abused its discretion when it refused to approve a preliminary injunction – based on the consent of all parties – that would have stayed liquidation of Arcelor's entries and preserved the *status quo* pending

2

resolution of Arcelor's challenge to the U.S. Department of Commerce's ("Commerce's") liquidation instructions.

     2.     Whether Arcelor will be deprived of a right to judicial review of Commerce's liquidation instructions, thereby suffering irreparable injury, in the absence of a preliminary injunction staying liquidation.

     3.     Whether Arcelor is likely to establish that Commerce acted contrary to law or in an arbitrary and capricious manner when it instructed Customs to liquidate entries of "SSPC [stainless steel plate in coils] hot rolled in Germany and not further cold rolled in Belgium" at the rates applicable to Belgian merchandise (J.A. 63, 65) where (a) Commerce's long-standing practice is that steel hot-rolled in a country (here, Germany) is merchandise from that country (*id.* at 139, 142); (b) Commerce determined in a subsequent review that Arcelor's "merchandise which is hot-rolled in Germany, and not further cold-rolled in Belgium, is German[]" (*id.* at 47-49); and (c) although Arcelor mistakenly entered the German hot-rolled SSPC as Belgian, it timely corrected the country-of-origin declaration before the entries were liquidated (*id.* at 98, 105-06).

## PRELIMINARY STATEMENT

Commerce is attempting by administrative fiat to cut off Arcelor's right to correct a mistake in its customs declarations. Unless enjoined by this Court, Commerce's liquidation instructions will require the U.S. Bureau of Customs and Border Protection ("Customs") to assess antidumping and countervailing duties on steel to which those duties do not apply. The Byrd Amendment[1] will then transfer those excess duties to the domestic steel industry (the "Domestic Industry"[2]). Commerce's instructions are arbitrary, capricious, and contrary to law.

1.      Arcelor imported into the United States SSPC that was hot-rolled in Germany but shipped from Belgium. Arcelor listed Belgium as the country of origin. That declaration was mistaken. Under U.S. customs laws, the country from which Arcelor's SSPC originated was Germany, not Belgium. Commerce's long-standing practice is to treat steel as a product of the country in which it was hot rolled (*see* J.A. 139, 142) – in this case, Germany. Indeed, in a subsequent review conducted after Arcelor corrected the mistaken country-of-origin declaration, Commerce determined that "because hot rolling constitutes substantial transformation, the country of origin of [Arcelor's] merchandise which is hot-

---

[1] Continued Dumping and Subsidy Offset Act of 2000, 19 U.S.C. § 1675c.

[2] The "Domestic Industry" refers to Defendants-Appellees Allegheny Ludlum, AK Steel Corp., Butler Armco Independent Union, United Steelworkers of America, AFL-CIO/CLC, and Zanesville Armco Independent Organization.

rolled in Germany, and not further cold-rolled in Belgium, is Germany. Therefore,

this merchandise is not subject to the order on SSPC from Belgium . . . ." *Id.* at 48;

*see id.* at 58 (July 1, 2005 Liquidation Instruction ¶ 3) ("Based on the evidence

reviewed by Commerce in conducting the administrative review of entries made

during this period (05/01/02-04/30/03), the Department has determined that

imports of SSPC hot rolled in Germany and not further cold rolled in Belgium are

not subject to the antidumping duty order on SSPC from Belgium. Entries of this

merchandise made on or after 05/01/02 should be liquidated without regard to

antidumping duties.") (capitalization omitted).

Notwithstanding Commerce's past practice and subsequent recognition that

"SSPC hot rolled in Germany and not further cold rolled in Belgium" is

"German[]" and "not subject to the antidumping duty order on SSPC from

Belgium" (*id.* at 48, 58), Commerce instructed Customs to liquidate prior "entries

of SSPC hot rolled in Germany and not further cold rolled in Belgium" at the

antidumping and countervailing duty rates "specified" in those instructions – that

is, the rates applicable to SSPC from *Belgium. Id.* at 63 (July 8, 2005 Liquidation

Instruction ¶ 7) (capitalization omitted) (countervailing duties); *id.* at 65 (July 18,

2005 Liquidation Instruction ¶ 5) (capitalization omitted) (antidumping duties). In

effect, Commerce instructed Customs to impose antidumping and countervailing

duties applicable to SSPC from Belgium on merchandise from Germany to which those duties do not apply.

2.    Commerce's liquidation instructions are lawless and arbitrary. They are contrary to law because they are flatly inconsistent with Commerce's long-standing practice. They are arbitrary because they treat identical merchandise as originating from different countries and subject to different duties based solely on the date they entered the country. Applying one rule to entries before May 1, 2002 and a different rule to entries of identical merchandise on and after that date is the essence of arbitrariness. Such discriminatory treatment demands a reasoned explanation.

For its part, Commerce offered no decision memorandum to explain its instruction to liquidate SSPC hot-rolled in Germany at the Belgium rate. Although it filed a decision memorandum in connection with its instruction to liquidate subsequent entries without antidumping and countervailing duties, that memorandum merely asserted that Commerce would not apply its determination to prior entries. It did not explain why, if the subsequent determination did not apply to prior entries of its own force, a different result was consistent with its own long-standing practice and subsequent determination. Absent a contemporaneous, reasoned explanation from Commerce, Arcelor is likely to succeed on the merits of

its challenge to Commerce's liquidation instructions. The CIT therefore abused its discretion when it refused to enter the preliminary injunction.

In the CIT and this Court (the latter in response to Arcelor's motion for an injunction pending appeal), the Government and Domestic Industry suggested that principles of administrative finality might explain Commerce's liquidation instructions. The invocation of administrative finality, however, is a *post hoc* rationalization; it cannot substitute for the reasoned explanation that must come, if at all, from the administrative agency. In any event, U.S. customs law entitles importers such as Arcelor to correct their declarations before the entries are liquidated. Commerce had no authority to cut off that right by administrative fiat. Because Arcelor is likely to succeed in its claim for injunctive relief, the CIT abused its discretion when it refused to enter the preliminary injunction.

### STATEMENT OF THE CASE

On July 22, 2005, Arcelor commenced this action by filing a complaint (J.A. 95-103) against the United States in the CIT to challenge two liquidation instructions as arbitrary, capricious, and contrary to law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (*see* 28 U.S.C. § 2640 (APA supplies standard of review for actions by Commerce)). At the same time that it filed its complaint, Arcelor moved for a temporary restraining order and preliminary

7

injunction to maintain the *status quo* and prevent Customs from liquidating Arcelor's entries while the CIT decided its claims on the merits. J.A. 4.

On July 27, 2005, the CIT entered a temporary restraining order with the Government's consent. *Id.* at 163-70.

Although both the Government and Domestic Industry also consented to the entry of a preliminary injunction (*id.* at 115-16, 127), on August 17, 2005, the CIT, in a currently unpublished opinion, *sua sponte* denied Arcelor's motion and refused to enter the preliminary injunction (Add. 7-19; J.A. 14-26).

Arcelor moved for reconsideration or, in the alternative, an injunction pending appeal. The Government consented to the entry of an injunction pending appeal. The Domestic Industry declined to take a position. On August 29, 2005, the CIT, in an unpublished opinion, denied reconsideration and an injunction pending appeal and vacated the temporary restraining order. Add. 23 n.4, 28-29; J.A. 30 n.4, 35-36.

On August 31, 2005, Arcelor filed a Notice of Appeal of the CIT's August 17 and 29, 2005 orders. J.A. 37. The next day, on September 1, 2005, Arcelor filed a motion for an injunction pending appeal with this Court. On September 2, 2005, the Court granted a temporary stay. On October 19, 2005, the Court granted an injunction pending appeal.

STATEMENT OF FACTS

A.    **Commerce Issued Anti-Dumping and Countervailing Duty Orders on SSPC from Belgium**

On March 31, 1998, the Domestic Industry filed petitions asking Commerce to initiate antidumping and countervailing duty investigations of SSPC from Belgium. On May 4, 1999, the International Trade Commission ("ITC") determined that SSPC from Belgium injured or threatened to injure the domestic industry.[3] On March 31, 1999, Commerce determined that countervailable subsidies were being provided to the producers and exporters of Belgian SSPC[4] and that Belgian SSPC was being sold at less than fair value.[5] On May 11 and 21, 1999, Commerce issued countervailing and antidumping duty orders (respectively) for SSPC from Belgium (the "Orders"). J.A. 143 ("Antidumping Duty Order"); *id.* at 147 ("Countervailing Duty Order").

Under the Antidumping Duty Order, importers are required to pay duties on Belgian SSPC equal to the difference between the price of the SSPC in the home

---

[3] *See* Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan Investigation Nos. 701-TA-376, 377, and 379 (Final), and Investigation Nos. 731-TA-788-793 (Final), USITC Pub. 3188 (May 1999).

[4] *See* Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils From Belgium, 64 Fed. Reg. 15567 (March 31, 1999)

[5] *See* Final Determination of Sales at Less Than Fair Value; Stainless Steel Plate in Coils from Belgium, 64 Fed. Reg. 15476 (March 31, 1999).

market ("normal value") and the price in the U.S. market ("constructed export price"). Under the Countervailing Duty Order, importers are required to pay duties on the countervailable subsidy rate determined by Commerce. German SSPC is not subject to duties under either Order.

**B.    Arcelor Mistakenly Declared Belgium as the Country of Origin of German Hot-Rolled SSPC**

From September 4, 1998 to April 30, 2002, Arcelor imported into the United States SSPC that was hot rolled in Germany and not further cold rolled in Belgium. J.A. 97. Although Arcelor should have declared Germany as the country in which its SSPC originated, it mistakenly declared the country of origin to be Belgium. *Id.* at 97-98; *see id.* at 47-49, 139, 142; *see also id.* at 73-74 (noting that mill certificates and production records submitted to Customs document that entries were hot-rolled in Germany and not further cold-rolled in Belgium).

**C.    Arcelor Filed Timely Protests with Customs to Correct Its Designation of German Hot-Rolled SSPC as Belgian and Obtain Refunds of Its Cash Deposits**

Promptly after realizing its mistake, Arcelor filed disclosures correcting its country-of-origin declarations and protests with Customs under 19 U.S.C. § 1514 to obtain refunds of its cash deposits. *See* 19 C.F.R. §§ 173.1, 173.2.[6]

---

[6] In its answer, the Government admits that Arcelor's "disclosures and protests were timely filed." J.A. 105-06.

10

**D.    Commerce Issued Liquidation Instructions Ordering Customs to Assess Antidumping and Countervailing Duties Applicable to Belgian SSPC on Arcelor's German Hot-Rolled SSPC**

In addition to filing disclosures and protests with Customs, Arcelor also informed Commerce of the mistake during the fourth administrative review of the antidumping order.[7] Consistent with its long-standing practice (*see* J.A. 139, 142), Commerce determined that "the country of origin for SSPC hot-rolled in Germany, and not further cold rolled in Belgium, is Germany" (*id.* at 47). Commerce reasoned:

> For merchandise hot-rolled in Germany, then pickled and annealed in Belgium, the question for purposes of country of origin is whether the process at issue constitutes substantial transformation. In this case, we determine that because hot rolling constitutes substantial transformation, the country of origin of [Arcelor's] merchandise which is hot-rolled in Germany, and not further cold-rolled in Belgium, is Germany. Therefore, this merchandise is not subject to the order on SSPC from Belgium and not reviewable in the instant proceeding.

---

[7] An administrative review is an annual proceeding that is held before Commerce at the request of an interested party (*e.g.*, an importer or the domestic industry) to determine the applicable rate of duties each importer of subject merchandise will be required to pay pursuant to the relevant antidumping and countervailing duty orders. *See generally Mitsubishi Elecs. America, Inc. v. United States*, 44 F.3d 973, 976-77 (Fed. Cir. 1994); 19 U.S.C. § 1675; 19 C.F.R. § 351.212(c)(1). Administrative reviews are thus a mechanism by which the terms of antidumping and countervailing duty orders are administered. Over time, there are commonly multiple administrative reviews of an antidumping or countervailing duty order.

*Id.* at 48; *see also id.* at 49. Consistent with that determination, Commerce

instructed Customs to treat Arcelor's entries of German hot-rolled SSPC as

German if they arrived in the United States on and after May 1, 2002. *See id.* at 58.

Although Commerce determined in the fourth antidumping review that

German hot-rolled SSPC is German, and instructed Customs to liquidate entries of

such merchandise on and after May 1, 2002 as German, it nonetheless instructed

Customs to liquidate entries of the identical merchandise before that date as

Belgian:

> Entries of SSPC hot rolled in Germany and not further cold rolled in
> Belgium should be liquidated at the antidumping duty rate [applicable to
> Belgian merchandise] specified above.

*Id.* at 65 (capitalization omitted); *accord, id.* at 63 (instructing Customs that

"[e]ntries of SSPC hot rolled in Germany and not further cold rolled in Belgium

should be liquidated at the countervailing duty rate [applicable to Belgian

merchandise] specified in these CBP instructions.") (capitalization omitted).

Commerce provided no decision memorandum to explain its liquidation

instructions for entries before May 1, 2002. In a decision memorandum

accompanying its liquidation instruction for entries on and after that date, however,

Commerce appears to conclude that it is free to instruct Customs to liquidate

entries of Arcelor's German hot-rolled SSPC as if they were Belgian as long as

12

that merchandise entered the United States before the period covered by the fourth administrative review. *See* J.A. 50-57.

### E.    The CIT Refused to Enter a Preliminary Injunction to Stay Liquidation

On July 22, 2005, Arcelor commenced this action in the CIT to challenge Commerce's July 8 and 18, 2005 liquidation instructions. J.A. 4. At the same time, Arcelor moved the CIT to enter a preliminary injunction preventing Customs from implementing Commerce's instructions. *See id.* Both Commerce and the Domestic Industry consented to the preliminary injunction. *See id.* at 115-16, 127. On August 17, 2005, however, the CIT denied the consent motion. Add. 7-19; J.A. 14-26.

In applying the four-factor test for entry of a preliminary injunction, the CIT first rejected Arcelor's contention that it would suffer irreparable harm on liquidation of its entries. Add. 8-10; J.A. 15-17. Although liquidation would ordinarily moot an importer's challenge and prevent judicial review of Commerce's determinations, the CIT noted that this Court's decision in *Xerox Corp. v. United States*, 289 F.3d 792, 795 (Fed. Cir. 2002), might provide an avenue for judicial review. Add. 8, 10; J.A. 15, 17 (remedy "not necessarily in jeopardy"; "one could assume" that protests before Customs would provide "some current protective comfort"; *Xerox* "makes it now difficult to conclude that [Arcelor's] procedural posture herein amounts to unequivocal irreparable harm").

13

Second, the CIT agreed with Arcelor that a balancing of the hardships favored a preliminary injunction in this case: "As for whatever harm is actually at bar, this court can conclude that it weighs more on [Arcelor] than on either the [Government] or the [Domestic Industry] for the reasons so succinctly stated, to wit: [¶] '. . . The government holds cash deposits. If Arcelor does not succeed on its claims, interested parties are fully secured.'" Add. 10; J.A. 17.

Third, the CIT noted that the public interest in favor of judicial review of administrative action "does not automatically favor" Arcelor. Add. 12; J.A. 19. Without further explanation, the CIT concluded: "it is not clear from the record, such as it has been presented initially, that the public's interest compels entry now of a preliminary injunction." *Id.*

Fourth, the CIT held that Arcelor did not establish a likelihood of success on the merits. The CIT claimed that "the main issue at bar" was whether Commerce's country-of-origin determination in the fourth administrative review "can be drawn into 'this proceeding.'" Add. 13; J.A. 20. Based on that characterization of Arcelor's action, the CIT concluded that Arcelor had not established a sufficient likelihood of success on the merits. Add. 13-19; J.A. 20-26.

On August 24, 2005, Arcelor filed with the CIT a motion for clarification and reconsideration or, in the alternative, for an injunction pending appeal. J.A. 5. Among other things, Arcelor raised the issue of the CIT's subject matter

jurisdiction, pointing out that the CIT's (apparent) extension of *Xerox* relief to cover this case would deprive the CIT of jurisdiction under 28 U.S.C. § 1581(i).

On August 29, 2005, the CIT once again denied Arcelor's request for a preliminary injunction. Add. 21-29; J.A. 28-36. The CIT acknowledged Arcelor's argument concerning subject-matter jurisdiction, but concluded that "it is not imperative that this court conclusively determine jurisdiction over an action as a predicate to ruling on the merits of such threshold equitable relief." Add. 25-26; J.A. 32-33. The CIT also raised, *sua sponte*, several issues it claimed impacted Arcelor's likelihood of success on the merits, including the alleged absence of record evidence to explain the reasons behind Arcelor's mistaken declarations and the possible liquidation of Arcelor's entries by operation of law ("deemed liquidation"). Add. 24-25; J.A. 31-32.

On August 31, 2005, Arcelor filed a notice of appeal from the CIT's August 17 and 29, 2005 orders. J.A. 37.

### SUMMARY OF ARGUMENT

The CIT abused it discretion when it refused to enter a preliminary injunction, for two reasons.

*First*, the CIT abused its discretion by rejecting the parties' agreement to a preliminary injunction. The parties agreed to an injunction to preserve the *status quo* while they resolved their dispute in an orderly fashion. The CIT should have

enforced the parties' agreement, not unilaterally abrogated it. A strong public policy supports the consensual resolution of disputes. Consistent with that policy, courts routinely issue preliminary injunctions to preserve the parties' positions. Although courts should not enter unlawful or unreasonable injunctions, the preliminary injunction that the parties proposed to the CIT was neither. The CIT abused its discretion when it refused to enter the injunction and compelled unnecessary litigation over an issue unrelated to the merits of the dispute.

*Second*, the CIT abused its discretion when it concluded that Arcelor failed to satisfy the four-factor test for preliminary injunctive relief. The CIT focused on two factors of that test – irreparable injury and likelihood of success on the merits.

The CIT concluded that Arcelor *might* not suffer irreparable injury because it *might* be able to protest Commerce's liquidation instructions before Customs. The CIT's conclusion is correct, however, only if this Court's decision in *Xerox Corp. v. United States*, 289 F.3d 792, 795 (Fed. Cir. 2002), extends beyond "decisions" by Customs that are reviewable by protest under the terms of 19 U.S.C. § 1514(a)(2), and includes the ministerial execution of instructions from Commerce. The extension of *Xerox* to protests to Commerce's liquidation instructions conflicts with decisions of the CIT and this Court. If this Court concludes that Commerce's liquidation instructions are decisions subject to protest under *Xerox*, then Arcelor has pending protests in which it may protest those

16

instructions. Conversely, if this Court concludes that Commerce's liquidation instructions are not subject to protest, then Arcelor has no protest remedy and would suffer irreparable injury in the absence of a preliminary injunction against liquidation.

The CIT also concluded that Arcelor failed to demonstrate a likelihood of success on the merits. As explained in the preliminary statement (*supra* pp. 3-6), however, Commerce's liquidation instructions are contrary to Commerce's long-standing practice and arbitrarily subject identical merchandise to different duty treatments based solely on the date they entered the country. Commerce offered no reasoned explanation for such discriminatory treatment. At most, Commerce asserted that it would not apply its determination in a subsequent review period to merchandise entered in prior periods. But it failed to explain why, if that subsequent determination did not apply to prior entries of its own force, a different result was consistent with its long-standing practice and subsequent determination. Absent a contemporaneous, reasoned explanation from Commerce, Arcelor is likely to succeed on the merits of its challenge to Commerce's liquidation instructions. The CIT therefore abused its discretion when it refused to enter the preliminary injunction.

## STANDARD OF REVIEW

This Court reviews the CIT's refusal to grant a preliminary injunction for abuse of discretion. *See, e.g., U.S. Ass'n of Importers of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005). The CIT abused its discretion if it made "a clear error of judgment, *or based its decision on an erroneous legal conclusion* or clearly erroneous factual findings." *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed. Cir. 2003) (emphasis added).

This Court reviews the legal conclusions on which the CIT based its decision *de novo. See, e.g., Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) ("As a necessary corollary to this standard of review, '[t]o the extent that the district court's decision to grant a preliminary injunction hinges on questions of law, [the Court's] review is de novo.'") (internal citations omitted); *Integraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1351-52 (Fed. Cir. 1999) (abuse-of-discretion standard for preliminary injunctions "requires plenary review of the correctness of the district court's rulings on matters of law, including the correctness of the legal criteria used in evaluating the likelihood of success on the merits")

18

ARGUMENT

I.    THE CIT ABUSED ITS DISCRETION WHEN IT REFUSED TO GRANT A
      PRELIMINARY INJUNCTION BASED ON THE PARTIES' CONSENT

The CIT abused its discretion in refusing to enter a preliminary injunction

based on the agreement of all interested parties in this case – namely, Arcelor, the

Government, and the Domestic Industry. As this Court has explained, there is a

strong public interest in the settlement of disputes because "settlement reduces

costs for all parties, conserves judicial and private resources, and promotes good

will." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998); *see Bano v.*

*Union Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001) (federal policy strongly

favors the settlement of disputes); *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*,

902 F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements,

because they represent compromise and conservation of judicial resources, two

concepts highly regarded in American jurisprudence."); *cf. Foster v. Hallco Mfg.*

*Co.*, 947 F.2d 469, 477 (Fed. Cir. 1991) ("strong public interest" in favor of

settlement).

The strong federal policy favoring the voluntary settlement of disputes

applies equally to settlements that include the issuance of injunctions, such as

consent decrees. *See SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991) (noting the

"strong federal policy favoring the approval and enforcement of consent decrees")

(citation omitted). In light of that policy, it is well settled that "courts should

19

approve consent decrees as long as they are not unconstitutional, unlawful, unreasonable, or contrary to public policy." *Stovall v. City of Cocoa*, 117 F.3d 1238, 1240 (11th Cir. 1997) (citations omitted); *see also SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved") (citations omitted). Because it is "the parties' consent [that] animates the legal force of a consent decree," courts may enter consent decrees that provide greater relief than might otherwise be available. *Local No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986) (citations omitted).

The presumption favoring approval of consent decrees "is particularly strong where a consent decree has been negotiated . . . on behalf of a federal administrative agency 'specially equipped, trained or oriented in the field.'" *United States v. Cannons Eng'g Corp.* 720 F. Supp. 1027, 1035 (D. Mass. 1989) (citation omitted). Thus, a trial court should accord "substantial deference to [an] agency's determination that [a] settlement is appropriate." *FTC v. Standard Financial Mgt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987) (citation omitted); *see also Randolph*, 736 F.2d at 529 ("courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment").

Under the foregoing principles, the CIT abused its discretion when it refused to approve the parties' consent agreement to the entry of a preliminary injunction

20

in this case. The agreement consisted merely of the Government's consent to stay liquidation of the entries of certain merchandise pending a final resolution of the merits of Arcelor's claims. The Government's agreement to stay liquidation for a temporary period of time was in no way "unconstitutional, unlawful, unreasonable, or contrary to public policy." *Stovall*, 117 F.3d at 1240. It was instead eminently reasonable and in the public interest because it would have expedited litigation on the merits and saved the parties (and the court system) the time and expense of litigating the propriety of a preliminary injunction. As such, the consent preliminary injunction should have been approved as a matter of course.

Importantly, that conclusion is consistent with the general practice of the federal courts. Where, as here, a defendant consents to the entry of a preliminary injunction, courts routinely grant such relief without independently evaluating the propriety of the injunction.[8] Presumably, courts follow that routine because of the obvious reasonableness of an agreement that merely maintains the *status quo* for a

---

[8] *See, e.g., National Helicopter Corp. of America v. City of New York*, 137 F.3d 81, 86 (2d Cir. 1998) (preliminary injunction staying enforcement of city resolution was entered based on the parties' consent); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1507 (9th Cir. 1995) (preliminary injunction entered based on defendant's consent); *Roe v. Operation Rescue*, 919 F.2d 857, 862 (3d Cir. 1990) ("[T]he parties agreed to a temporary consent decree that provided for a preliminary injunction to remain in effect until the hearing on the permanent injunction. An order was entered by the court in accordance with this consent decree"); *Fed. Sav. & Loan Ins. Corp. v. Blain*, 808 F.2d 395, 397 (5th Cir. 1987) (parties consented to preliminary injunction prohibiting transfer of certain assets).

21

temporary period pending final resolution of the parties' dispute. Indeed, the CIT

typically enters preliminary injunctions staying the liquidation of entries of

merchandise based on the consent of the Government in antidumping cases. *See,*

*e.g., Jinfu Trading Co. v. United States*, No. 04-00597, 2005 WL 226174 (C.I.T.

Jan. 31, 2005); *Federal-Mogul Corp. v. United States*, 808 F. Supp. 839 (C.I.T.

1992); *PAM S.p.A. v. United States*, 347 F. Supp. 2d 1362, 1365 (C.I.T. 2004).

> As the CIT explained in *PAM*,
>
> [i]n most countervailing and antidumping duty cases, it is the general
> practice before this Court that motions for preliminary injunctions come
> before the court on consent of the parties. In granting such motions, the
> Court usually cites the parties' consent to the motion as the 'facts upon
> which the decision' to grant the injunction is based.

*Id.* There was no justification for the CIT's refusal to follow that practice here.

This Court should vacate the CIT's orders and remand this action with instructions

to enter a preliminary injunction based on the consent of the parties.

## II.   THE CIT ABUSED ITS DISCRETION IN HOLDING THAT ARCELOR FAILED TO SATISFY THE TRADITIONAL FOUR-FACTOR TEST FOR A PRELIMINARY INJUNCTION

Even if the CIT did not abuse its discretion in refusing to grant a preliminary

injunction based on the parties' consent, it should have granted a preliminary

injunction under the traditional test governing such injunctions. The precedent of

this Circuit required the CIT to weigh four factors in determining whether to issue

a preliminary injunction: (1) the possibility of immediate and irreparable injury to

the movant absent an injunction; (2) the injunction applicant's likelihood of

success on the merits; (3) the balance of hardship on all the parties; and (4) where

the public interest lies. *E.g., Zenith Radio Corp. v. United States*, 710 F.2d 806,

809 (Fed. Cir. 1983); *U.S. Ass'n of Importers of Textiles*, 413 F.3d at 1346. The

four-factor test is a flexible one that is intended to result in "individualized

judgments in each case." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). "No one

factor, taken individually, is necessarily dispositive." *FMC Corp. v. United States*,

3 F.3d 424, 427 (Fed. Cir. 1993). Thus, a court must balance the relevant factors

against each other. *Id.*

    In this case, the CIT held that although a balancing of the hardships favored

entry of a preliminary injunction, Arcelor did not show that such an injunction was

justified by the threat of irreparable injury or a likelihood of success on the merits.

Add. 7-19; J.A. 14-26. Because the CIT's opinions on the absence of irreparable

injury and lack of success on the merits rest on the legal conclusions, they are

reviewed *de novo* by this Court. As demonstrated below, the CIT's legal

conclusions were clearly erroneous. The CIT accordingly abused its discretion

when it refused to enter the preliminary injunction.

A.    **Assuming that Arcelor Has No Right to Protest Commerce's Liquidation Instructions Before Customs, It Will Suffer Irreparable Injury in the Absence of an Injunction**

In *Zenith Radio Corp.*, this Court held that, in cases challenging the imposition of antidumping duties, importers will suffer irreparable injury in the absence of an injunction staying liquidation. 710 F.2d at 810. Irreparable injury is inevitable because "[t]he statutory scheme has no provision permitting reliquidation" or "imposition of [a different rate for] dumping duties after liquidation if [plaintiff] is successful on the merits." *Id.* Liquidation thus deprives an importer of its right to judicial review. *See id.*; *see also SKF USA Inc., v. United States*, 316 F. Supp. 2d 1322, 1328 (C.I.T. 2004) (because "liquidation would permanently deprive Plaintiffs SKF of the opportunity to contest Commerce's results for the administrative review by rendering Plaintiffs' cause of action moot," failure to grant an injunction enjoining liquidation would result in irreparable injury); *NMB Singapore Ltd. v. United States*, 120 F. Supp. 2d 1135, 1139 (C.I.T. 2000) ("The Federal Circuit and this Court have long recognized the severe harm caused by liquidation . . . . Because a foreign manufacturer or exporter cannot recover liquidated duties when it successfully challenges the underlying administrative determination, in the absence of a preliminary injunction, judicial review would provide the plaintiff with no tangible benefit."); *Laclede Steel Co. v. United States*, 928 F. Supp. 1182, 1188 (C.I.T. 1996) ("[L]iquidation of entries

24

extinguishes the underlying res and the accompanying cause of action, stripping

[the] Court of the ability to provide a remedy to an importer." ); *Asociacion*

*Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1573

(Fed. Cir. 1990) ("Once an entry has been liquidated, the duty paid cannot be

recovered even if the payor subsequently prevails in its challenge to the

antidumping order.").[9] In denying Arcelor's request for a preliminary injunction,

the CIT recognized that *Zenith* is "seminal authority." Add. 8; J.A. 15. Moreover, it

acknowledged that irreparable harm will typically occur unless an injunction stays

liquidation. *Id.*

The CIT suggested, however, that irreparable injury might not occur in this

case because Arcelor might be able to protest Commerce's liquidation instructions

before Customs. Add. 10; J.A. 17. Because a protest automatically prevents final

liquidation (*see* 19 U.S.C. § 1514(a)), a preliminary injunction would be

unnecessary if Arcelor could protest Commerce's liquidation instructions before

Customs.

The effectiveness of the CIT's protest remedy, however, depends on an

extension of *Xerox Corp. v. United States*, 289 F.3d 792, 795 (Fed. Cir. 2002). In

---

[9] *But cf. Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1309 (Fed. Cir. 2004) (holding that in a case not brought under 19 U.S.C. § 1515 or § 1516a a court may rely on equitable powers to order reliquidation, even though that relief is not specifically provided by the governing statute).

*Xerox*, this Court held that Customs' misapplication of an antidumping or countervailing duty order was properly the subject of protest under 19 U.S.C. § 1514(a)(2), and was reviewable by the CIT under 28 U.S.C. § 1581(a). *Xerox* involved a challenge to an independent liquidation "decision" by Customs. Such "decisions" are reviewable by protest under the terms of 19 U.S.C. § 1514(a)(2). By contrast, in this case Arcelor's protest would challenge Customs' application of specific liquidation instructions from Commerce, not an independent liquidation "decision" by Customs. Where Commerce has issued specific liquidation instructions, Customs arguably "has a merely ministerial role" that is not subject to a *Xerox* protest. *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 977 (Fed. Cir. 1994). Indeed, the very case on which the CIT relied to extend *Xerox* (Add. 10; J.A. 17), holds that where "Commerce sent liquidation instructions to Customs, which then imposed antidumping duties as directed by Commerce as part of its ministerial functions," Commerce's liquidation instructions *would not be subject to protest and "[t]he court has no jurisdiction pursuant to [28 U.S.C.] § 1581(a) for it was Commerce's instructions, rather than an independent decision by Customs, which determined the antidumping rate." J.S. Stone Inc. v. United States*, 297 F. Supp. 2d 1333, 1338 (C.I.T. 2003) (emphasis added).

*Xerox* would not appear to give Arcelor a right to protest Commerce's liquidation instructions before Customs and obtain judicial review. Because the

proper reading of *Xerox* determines whether Arcelor will suffer irreparable injury absent an injunction, the Court must resolve the issue.

This Court must also resolve the *Xerox* issue to determine whether the CIT and this Court have jurisdiction over the current action. The basis for the CIT's subject-matter jurisdiction is the residual jurisdiction provision of 28 U.S.C. § 1581(i). That section provides jurisdiction, however, only in those actions that could not have been brought under any other provision of § 1581. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1002 (Fed. Cir. 2003). If Arcelor could protest Commerce's liquidation instructions before Customs, it could also obtain judicial review under § 1581(a). In that event, the CIT (and thus this Court) would have no subject-matter jurisdiction over Arcelor's current action. *Id.*

**B.    Arcelor Has a Strong Likelihood of Establishing that Commerce's July 8 and 18, 2005 Liquidation Instructions Were Arbitrary, Capricious, and Contrary to Law**

If Arcelor cannot protest Commerce's liquidation instructions under *Xerox*, and if Arcelor will therefore suffer irreparable injury in the absence of an injunction, then a preliminary injunction is plainly warranted. It is well settled that the likelihood-of-success-on-the-merits factor "must be balanced against the comparative injuries of the parties." *Ugine-Savoie Imphy v. United States*, 121 F. Supp. 2d 684, 689 (C.I.T. 2000) (citation omitted)."This balancing involves an inverse relationship between the level of hardship the moving party will suffer if

the preliminary injunction is denied and the standard that must be met to demonstrate a likelihood of success on the merits. The greater the harm to the moving party, the lower the standard will be." *Id.* "Where it is clear that the moving party will suffer substantially greater harm by the denial of the preliminary injunction than the non-moving party would by its grant, it will ordinarily be sufficient that the movant has raised serious, substantial, difficult and doubtful questions that are the proper subject of litigation." *Id.* (internal quotations and citation omitted); *see also SKF USA Inc.*, 316 F. Supp. 2d at 1329 ("The greater the potential harm to the plaintiff, the lesser the burden on Plaintiffs to make the required showing of likelihood of success on the merits.") (citations omitted).

Assuming that Arcelor cannot protest Commerce's liquidation instructions before Customs, it will be deprived of its property without review by this or any other court. In that event, Arcelor will have more than satisfied the requirements for a preliminary injunction.

Even if the irreparable-injury factor did not tip the scales so decisively in favor of a preliminary injunction, Arcelor has demonstrated a strong likelihood of success on the merits. Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Commerce's July 8 and 18, 2005 liquidation

28

instructions – which instruct Customs to assess duties applicable to Belgian SSPC on Arcelor's German hot-rolled SSPC – are unlawful and arbitrary. Commerce failed to offer a contemporaneous, reasoned explanation for those instructions. The administrative-finality justification offered by the Government and Domestic Industry in this litigation are *post hoc* rationalizations that cannot substitute for a reasoned decision by the administrative agency and is in any event contrary to Arcelor's right under customs law to correct declarations before liquidation.

> ## 1. *Under Long-Standing Practice, SSPC Hot Rolled in Germany and Not Further Cold Rolled in Belgium Originated in Germany, Not Belgium*

As explained in the preliminary statement (*see supra* pp. 3 to 6), Commerce's instructions to liquidate "entries of SSPC hot rolled in Germany and not further cold rolled in Belgium" at the antidumping and countervailing duty rates "specified" for SSPC from Belgium (J.A. 63, 65), are contrary to Commerce's long-standing practice (*see id.* at 139, 142) and arbitrarily inconsistent with its determination in a subsequent review that "the country of origin of [Arcelor's SSPC] which is hot-rolled in Germany, and not further cold-rolled in Belgium, is Germany" (*id.* at 48). Commerce's departure from past practice and facially disparate treatment of identical merchandise based solely on the date of entry requires a good reason. Commerce has not offered one.

2.   *Commerce Failed to Provide a Reasoned Explanation for Instructing Customs to Liquidate German Hot-Rolled SSPC at the Duty Rate Applicable to Belgian SSPC*

Unlike acts of Congress, which courts generally uphold as long as they can infer a rational basis, administrative action requires a reasoned explanation. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 50 (1983); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). Moreover, the agency must supply that explanation at the time of its decision. *Post hoc* rationalizations supplied during the course of litigation cannot sustain an agency's action. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (the arbitrary and capricious standard "mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision."); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("the courts may not accept appellate counsel's post hoc rationalizations for agency action . . . . It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citing, *inter alia, Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 165-69 (1962)); *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (agency may not defend its decision on grounds not previously articulated by the

30

agency); *Airmark Corp. v. FAA*, 758 F.2d 685, 695 (D.C. Cir. 1985) (if a court

must "guess as to what the [agency's] decisional criteria are or should be," the

agency's order is arbitrary and capricious).

In this case, Commerce failed to articulate a reasoned explanation for its

transparently unlawful and facially discriminatory treatment of German hot-rolled

SSPC entered before May 1, 2002. Commerce issued no decision memorandum to

explain the liquidation instructions it issued on July 8 and 18, 2005. Because those

instructions departed from past practice and contradicted Commerce's own

determination, they required a reasoned explanation. To be sure, Commerce issued

a decision memorandum on July 1, 2005 for SSPC that entered the United States

during the fourth administrative review. *See* J.A. 50 ("Customs instructions for the

Final Results of the Fourth Administrative Review"). But that memorandum

accompanied Commerce's July 1, 2005 instructions to liquidate entries of German

hot-rolled SSPC on and after May 1, 2002 "without regard to antidumping duties."

*Id.* at 58. It did not provide an explanation for the July 8 and 18, 2005 instructions,

which Commerce had not yet finalized.

In any event, to the extent that Commerce's July 1, 2005 decision

memorandum suggests a basis for treating German hot-rolled SSPC entered before

May 1, 2002 as Belgian, at the same time as identical merchandise entered on and

after that date is treated as German, that basis is a *non sequitur*. Commerce's

31

memorandum asserts that because the country-of-origin issue "first was raised during the fourth administrative period," Commerce would "apply[] our country of origin determination to entries covered by the fourth administrative review and future entries, i.e., to entries made on or after May 1, 2002." J.A. 54. But it does not follow from the fact that Commerce's fourth-period determination applies to entries on and after that period, that Commerce can lawfully apply the opposite determination to entries in prior periods. To put it another way, if the fourth-period determination did not apply to entries in prior periods of its own force, then the absence of an applicable determination simply posed the question: what was the country of origin of German hot-rolled SSPC in those prior periods? Commerce simply failed to answer that question. The absence of a reasoned explanation requires the vacation of the CIT's decision below.

     3.    *Commerce's Instructions Cannot Be Justified on Grounds of Administrative Finality*

In the CIT and this Court (the latter on Arcelor's motion for an injunction pending appeal), the Government and Domestic Industry suggest that administrative finality provides a reasoned basis for treating German hot-rolled SSPC entered before May 1, 2002 as originating from Belgium and the identical merchandise entered on and after that date as originating from Germany. To begin with, that rationale is a *post hoc* rationalization that was not offered by Commerce and cannot sustain the challenged liquidation instructions. *See supra* pp. 26-29.

32

In any event, the administrative-finality rationale is directly contrary to customs law. Customs law not only permits, but also requires importers such as Arcelor to correct the country of origin and other mistaken declarations up until the time of liquidation.

Customs assesses duties on imported merchandise on the basis of declarations filed by importers, including declarations designating the country of origin. *See* 19 C.F.R. § 142.3 (listing the documentation an importer must file at time of entry, including the invoice); *see also* 19 C.F.R. § 141.86(a)(10) (specifying that country of origin must be set forth on the invoice). An importer has 180 days after notice of liquidation to file a protest and prevent finality of liquidation. *See* 19 U.S.C. § 1514(c)(3). In the protest proceeding, Customs will find facts and apply the customs laws. *See* 19 U.S.C. § 1514(a); *see also* 19 U.S.C. § 1515(a) (providing that the appropriate customs officer shall review a protest under § 1514 and shall allow or deny such protest in whole or in part). Customs' determination is subject to review by the CIT and this Court. *See* 28 U.S.C. § 1581(a); 28 U.S.C. § 1295(a)(5).

Congress established final liquidation as the deadline for correcting entries. *See* 19 U.S.C. § 1514(a) (noting that liquidation "shall be final and conclusive . . . unless a protest is filed in accordance with this section"); *see also, e.g., United States v. Utex Int'l, Inc.*, 857 F.2d 1408, 1410 (Fed. Cir. 1988) (noting "[i]t is the

33

liquidation which is final and subject to protest, not the preliminary findings or decisions of customs officers") (citations omitted); *United States v. Cherry Hill Textiles*, 112 F.3d 1550, 1552 (Fed. Cir. 1997) (tracing the history of § 1514 back to 1864 and noting, even at that time, that the amount of duties owed would become "final and conclusive" upon liquidation absent protest). The liquidation rule applies to the correction of an importer's declarations at entry, including mistaken designations of the country of origin. *See C.J. Tower & Sons of Niagara, Inc. v. United States*, 70 Cust. Ct. 1 (Cust. Ct. 1973) (noting that importer protested country-of-origin designation before Customs); *Ferrostal Metals Corp. v. United States*, 664 F. Supp. 535, 536 (C.I.T. 1987) (resolving appeal after protest to Customs challenging country-of-origin designation); *cf. Chrysler Corp. v. United States*, 87 F. Supp. 2d 1339 (C.I.T. 2000) (holding that car manufacturer could correct mistaken country-of-origin designation under 19 U.S.C. § 1520).

Indeed, Arcelor was not only entitled to correct its mistaken country-of-origin designations, it was required to do so. Under 19 U.S.C. §§ 1481 & 1484, importers are required to use "reasonable care" to declare the correct country of origin of imported goods. *See also* 19 C.F.R. §§ 134.0 *et seq.*, 141.85, & 177.22. If an importer knowingly fails to correct an erroneous country-of-origin designation, it may be subject to penalties under 19 U.S.C. § 1592. *See United States v. Golden Ship Trading Co.*, 25 CIT 40 (2001) (finding defendant failed to exercise

reasonable care because she failed to verify the information contained in the entry documents); *United States v. FAG Bearings Corp.*, 615 F. Supp. 562, 569 (C.I.T. 1984). The importer's responsibility for reviewing an entry transaction for correctness extends through the time the entry is liquidated. *See* 19 C.F.R. § 173.2(a). Commerce has no authority to cut short that time by administrative fiat.

In sum, because Arcelor had a statutory right to correct its misdesignation of German merchandise as Belgian up until liquidation, Commerce's instructions depriving Arcelor of that right were arbitrary, capricious and contrary to law.

## C.   The Balance of Hardships Weighs in Favor of a Preliminary Injunction

A balancing of the hardships tips in favor of preserving the *status quo* pending the resolution of this action. As the CIT recognized, "whatever harm is actually at bar . . . it weighs more on [Arcelor] than on either the [Government] or the [Domestic Industry] for the reasons so succinctly stated, to wit: [¶] . . . The government holds cash deposits. If Arcelor does not succeed on its claims, interested parties are fully secured." Add. 10; J.A. 17; *see also SKF USA Inc.*, 316 F. Supp. 2d at 1328-29 (because the Government will "ultimately collect or refund, with interest, any amounts owed from or due to the plaintiffs at the conclusion of this litigation," the Government and domestic industry will at most suffer "inconvenience" as the result of the delay; "[s]hould the court, however, fail to issue a preliminary injunction, Plaintiffs' entries could be liquidated, thus,

permanently depriving them of both a potential refund and the ability to contest Commerce's final results") (citation omitted).

### D.    The Public Interest Will Be Served by Preserving the *Status Quo*

The public has a compelling interest in judicial review of administrative action. As a consequence, the public interest suggests that this Court exercise its equitable powers to enjoin the liquidation of entries that would moot this case and deprive the federal courts of jurisdiction to review Commerce's liquidation instructions and to give Arcelor its day in court. *See, e.g., Ugine-Savoie Imphy,* 121 F. Supp. 2d at 690 (noting "the public interest is served by preserving the Plaintiffs' right to meaningful judicial review."). The CIT's conclusion in *PPG Indus., Inc. v. United States,* 11 CIT 5, 10 (1987), applies here:

> In this case, the public interest would be served best by granting the injunction. Plaintiff has raised substantial questions bearing upon the propriety of the agency's actions. An injunction will preserve plaintiff's rights until the merits and the issue of compliance with the law are fully considered. It will provide interim relief until those doubts that have been raised are eliminated. Any inconveniences that arise as a result of granting the injunction are outweighed by the irreparable harm and injury plaintiff will incur if the entries are liquidated.

As the CIT explained in *Ceramica Regiomontana, S.A. v. United States,* 590 F. Supp. 1260, 1265 (C.I.T. 1984): "[T]here can be no doubt that [the public interest] is best served by ensuring that the [International Trade Administration] complies with the law, and interprets and applies our international trade statutes uniformly and fairly." In this case, Commerce issued liquidation instructions that

36

would impose duties on merchandise contrary to the terms of the antidumping and

countervailing duty orders. The public has a strong interest in ensuring that agency

actions such as this one are subject to judicial review and that the Government is

required to comply with the law.

### CONCLUSION

For the foregoing reasons, the orders below should be reversed and the case

remanded with instructions to the CIT to enter a preliminary injunction prohibiting

the liquidation of the entries listed at J.A. 163-68 until final judgment and the

conclusion of all appeals.

SHEARMAN & STERLING LLP

*Stephen J. Marzen*

Stephen J. Marzen
Robert S. LaRussa
Wendy E. Ackerman
Jonathan R. DeFosse
Ryan A. T. Trapani[*]
801 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20004-2604
(202) 508-8000
(202) 508-8100 (fax)
Counsel for Ugine & ALZ Belgium;
Arcelor Stainless USA LLC; and Arcelor
Trading USA, LLC

Dated: October 31, 2005

---

[*] Admitted only in the State of New York, supervised by the partners of Shearman
& Sterling LLP.

# EXHIBIT 5
# PART 2

# **ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

**Page**

Opinion and Order of
The Honorable Thomas J. Aquilino, Jr.
Re: Denying Plaintiffs' Preliminary Application to
Enjoin Department of Commerce Liquidation Instructions to
Bureau of Customs and Border Protection
      filed August 17, 2005 ................................... Add. 1

Memorandum and Order of
The Honorable Thomas J. Aquilino, Jr.
Re: Denying Plaintiffs' Renewed Motion to
Enjoin Department of Commerce Liquidations Instructions to
Bureau of Customs and Border Protection
      filed August 29, 2005 ................................. Add. 21

Slip Op. 05 - 97

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - x
UGINE & ALZ BELGIUM, N.V.; ARCELOR  :
STAINLESS USA, LLC; and ARCELOR TRAD- :
ING USA, LLC,                        :
                                     :
                    Plaintiffs,      :
                                     :
           v.                        :   Court No. 05-00444
                                     :
UNITED STATES,                       :
                                     :
                    Defendant.       :
- - - - - - - - - - - - - - - - - - - x

Opinion & Order

[Plaintiffs' preliminary application to
 enjoin Department of Commerce liquidation
 instructions to Bureau of Customs denied.]

Dated:  August 17, 2005

Shearman & Sterling LLP (Robert S. LaRussa, Stephen J. Marzen and Ryan A.T. Trapani) for the plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (Ada Loo and Arthur Sidney) and Bureau of Customs and Border Protection, U.S. Department of Homeland Security (Christopher Chen), of counsel, for the defendant.

Collier Shannon Scott, PLLC (David A. Hartquist, R. Alan Luberda, Kathleen W. Cannon and Adam H. Gordon) for proposed intervenor-defendants AK Steel Corporation, Allegheny Ludlum Corporation, North American Stainless, United Auto Workers Local 3303, Zanesville Armco Independent Organization, and United Steelworkers of America, AFL-CIO/CLC.

AQUILINO, Senior Judge:  Jurisdiction of the court is pleaded to be pursuant to 28 U.S.C. §1581(i) over the subject matter of this action, which is the propriety of certain liquida-

Court No. 05-00444                                              Page 2

tion instructions that have been issued to the Bureau of Customs

and Border Protection, U.S. Department of Homeland Security[1] by the

International Trade Administration, U.S. Department of Commerce[2] in

conjunction with its <u>Notice of Amended Final Determinations:</u>

<u>Stainless Steel Plate in Coils from Belgium and South Africa; and</u>

<u>Notice of Countervailing Duty Orders: Stainless Steel Plate in</u>

<u>Coils from Belgium, Italy and South Africa</u>, 64 Fed.Reg. 25,288 (May

11, 1999), and its <u>Antidumping Duty Orders; Certain Stainless Steel</u>

<u>Plate in Coils From Belgium, Canada, Italy, the Republic of Korea,</u>

<u>South Africa, and Taiwan</u>, 64 Fed.Reg. 27,756 (May 21, 1999).

                                    I

        In commencing this action via summons and complaint,

counsel for the plaintiffs also filed applications for immediate

injunctive relief. The court promptly thereupon conferred with

them and counsel for the defendant (and the proposed intervenor-

defendants) who consented to entry (on July 27, 2005) of a

temporary restraining order, which, among other things, enjoins CBP

> from implementing Liquidation Instructions issued by the
> [ITA] in conjunction with Message No. 5182203 (July 1,
> 2005)[,] Message No[.] 5189205 (July 8, 2005), Message
> No. 5189204 (July 8, 2005), Message No. 5199201 (July 18,
> 2005), or otherwise taking any action that results in the
> treatment of entries of Stainless Steel Plate in Coils
> hot rolled in Germany and not further cold rolled in
> Belgium as having a country of origin of Belgium for the
> purpose of assessing antidumping or countervailing
> duties[.]

---

[1] Referred to hereinafter as "CBP".

[2] Referred to hereinafter as "ITA".

The order covers listed entries of subject merchandise ("SSPC") in the ports of Chicago (between July 29, 1999 and Oct. 31, 2001), Houston (between Oct. 26, 1998 and Feb. 23, 2002), Los Angeles (on April 13, 1999), Portland (between Feb. 10, 1999 and Jan. 29, 2002), Richmond (between Feb. 24, 1999 and July 17, 2001), Seattle (between March 4, 1999 and Jan. 13, 2000), and Philadelphia (between Sept. 8, 1998 and Feb. 25, 2002).

The defendant also consented to the motion of the above-named domestic interested parties and certified or recognized unions within the meaning of 19 U.S.C. §1677(9)(C) and (D) for leave to intervene in this action as parties defendant. The plaintiffs have now filed papers in opposition to this motion to intervene, arguing, among other things, that this action

> is one solely between [them], whose entries are at issue, and the Government.

> For their part, [the] . . . Proposed Intervenors·[] cannot identify any legally cognizable interest in this proceeding. Contrary to [their] suggestion, this proceeding is not an appeal of administrative review proceedings. Proposed Intervenors' interested party status in such an appeal is thus entirely irrelevant. Nor is this proceeding one to determine whether or to what extent Proposed Intervenors are entitled to disbursements from the special accounts created by the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"), 19 U.S.C. § 1675c. As the Government has argued before the World Trade Organization ("WTO"), the CDSOA is merely a disbursement program and "has nothing to do with imported goods or importers." . . . Ex. 1. The CDSOA deals only with the allocation and disbursement of already collected duties, not the Government's prior discretionary procedures to assess and collect those duties.

Court No. 05-00444                                    Page 4

Memorandum in Opposition to Motion to Intervene, pp. 1-2.  This

opposition has engendered in turn a motion by the proposed

intervenor-defendants for leave to respond to the plaintiffs, which

motion is hereby granted.  The response is, in part, that,

> while domestic parties may not appeal a liquidation by
> Customs that has occurred, they can participate in a
> challenge to liquidation instructions issued by Commerce
> prior to liquidation.  Arcelor cites no authority to the
> contrary.  Proposed intervenors were interested parties
> in the proceedings that generated the challenged liquida-
> tion instructions, and indeed, Commerce sought comments
> from the domestic industry as well as Arcelor as to the
> appropriate scope and nature of those instructions.  Pro-
> posed intervenors clearly have a cognizable interest in
> the instructions issued and the underlying decision that
> they represent.

Motion for Leave to Respond to Plaintiffs' Opposition to Motion to

Intervene, pp. 2-3.

        Upon consideration of the arguments, well-presented on

both sides, the court concludes that the determinative factor is

the direct participation before the ITA by the petitioners-cum-

proposed-parties-at-bar in the agency promulgation of the liquida-

tion instructions now at issue herein.  See, e.g., Memorandum in

Support of Plaintiffs' Motion for Temporary Restraining Order and

Preliminary Injunction [hereinafter "Plaintiffs' Memorandum"], Ex-

hibit 9.  That is, having been privy to and part of that admini-

strative process, their motion for leave to formally join the

judicial review of the results thereof can be, and it hereby is,

granted.

Court No. 05-00444                                     Page 5

## II

According to the complaint and corporate disclosure statements on USCIT Form 13 filed in conjunction therewith, the first-named plaintiff is a corporation organized under the laws of Belgium, whereas the two Arcelor firms are creatures of the law of Delaware, U.S.A. All three corporations are wholly-owned subsidiaries of a Luxembourg corporation, Arcelor S.A. Their complaint avers:

### German SSPC Mistakenly Entered as Belgian Merchandise

9. From September 4, 1998 to April 30, 2002, Arcelor imported into the United States SSPC that was hot rolled in Germany and not further cold rolled in Belgium. The country of origin of such merchandise is Germany.

10. Although the SSPC was not further cold rolled in Belgium, it was pickled, annealed, packaged, and shipped from Belgium. Accordingly, at the time of entry, Arcelor mistakenly declared the country of origin for the merchandise to be Belgium rather than Germany.

11. At the time Arcelor's German SSPC entered the United States, the Antidumping and Countervailing Duty Orders for SSPC from Belgium were in effect.

12. Arcelor paid cash deposits of antidumping and countervailing duties on the German hot-rolled SSPC that entered the United States at the rates specified in the Orders for Belgian SSPC.

13. Because the country of origin of the SSPC imported by Arcelor is Germany, that merchandise was not and never has been subject to the Antidumping and Countervailing Duty Orders for S[SPC] from Belgium and Arcelor should not have had to pay cash deposits of antidumping and countervailing duties.

14. Promptly after realizing its mistake, Arcelor filed disclosures and timely protests with Customs pursuant to 19 U.S.C. § 1514 to correct the country of origin.

15. For its part, Commerce mistakenly included the German SSPC in its calculation of the antidumping duty rates for Belgian SSPC in the first, second and third periods of review.

\*   \*   \*

16. Consistent with its long-standing practice, in the Fourth Administrative Review of the Antidumping Duty Order for S[SPC] from Belgium, Commerce determined that SSPC hot rolled in Germany and not further cold rolled in Belgium is German. . . .

\*   \*   \*

**Commerce Instructed Customs to Liquidate Entries of Arcelor's German SSPC as Belgian Merchandise**

\*   \*   \*

20. On July 1, 2005, Commerce issued to Customs . . . Fourth Review Period Antidumping Duty Liquidation Instructions []. Those instructions limited - to entries of SSPC made on or after May 1, 2002 - application of Commerce's determination that SSPC hot rolled in Germany and not further cold rolled in Belgium is not subject to the Antidumping Duty Order.

21. On July 1, 2005, Commerce issued a memorandum attempting to explain its reasons for issuing the Fourth Review Period Antidumping Duty Liquidation Instructions. . . . Commerce refused to state that all SSPC hot rolled in Germany and not further cold rolled in Belgium, imported by Arcelor, is German for country-of-origin purposes. . . .

22. On July 8, 2005, . . . Commerce issued . . . for . . . entries for the period 09/01/1998 through 12/31/1999 [] "Countervailing Duty Liquidation Instructions" [that] . . . instructed Customs to liquidate SSPC hot rolled in Germany and not further cold rolled in Belgium as merchandise subject to the countervailing duty order for SSPC from Belgium. . . . Commerce gave no reason why it instructed Customs to liquidate German merchandise as Belgian.

23. On July 8, 2005, . . . . Commerce issued Countervailing Duty Cash Deposit Instructions for S[SPC] from Belgium [that] . . . instructed Customs that

"[e]ffective 05/01/2002 . . . entries of SSPC hot roll-
ed in Germany and not further cold rolled in Belgium
are not subject to the suspension of liquidation and do
not require cash deposits of estimated countervailing
duties."   . . .

24. On July 18, 2005, Commerce instructed Customs
to liquidate German hot rolled SSPC entered between
November 4, 1998 and April 30, 2000 as subject to the
Antidumping Duty Order for SSPC from Belgium.   . . . As
with the Countervailing Duty Liquidation Instructions,
Commerce gave no reason why it instructed Customs to
liquidate German merchandise as Belgian.[3]

Whereupon the plaintiffs claim that the referenced liquidation

instructions are arbitrary, capricious, an abuse of discretion, and

otherwise not in accordance with law under 5 U.S.C. §706(2)(A).

They pray for a declaratory judgment to this effect, which would be

the basis of injunction(s) against those instructions and a pos-

sible remand to the defendant in connection therewith.

A

The plaintiffs recognize, as they must, that a prelimi-

nary injunction is an extraordinary remedy and can only be granted

upon showing:

(1) A threat of immediate irreparable harm; (2) that the
public interest would be better served by issuing than by
denying the injunction; (3) a likelihood of success on
the merits; and (4) that the balance of hardship on the
parties favor[s issuance].

S.J. Stile Associates, Ltd. v. Snyder, 68 CCPA 27, 30, C.A.D. 1261,

646 F.2d 522, 525 (1981).  That is, failure to bear the burden of

_____

[3] Boldface headings in original; citations omitted.

persuasion as to any of these four factors is ground for denial of
an application.  E.g., <u>American Stevedoring Inc. v. U.S. Customs
Service</u>, 18 CIT 331, 335, 852 F.Supp. 1067, 1071 (1994), citing <u>Bo-
mont Industries v. United States</u>, 10 CIT 431, 638 F.Supp. 1334
(1986), and <u>FMC Corporation v. United States</u> 3 F.3d 424, 427 (Fed.
Cir. 1993).  <u>See</u> Plaintiffs' Memorandum, p. 5, citing <u>Zenith Radio
Corp. v. United States</u>, 710 F.2d 806, 809 (Fed.Cir. 1983).

(1)

        <u>Zenith</u> is, of course, seminal authority with regard to
the Trade Agreements Act of 1979, as amended, but the controlling
issue therein was whether liquidation of the underlying entries
would eliminate the only remedy for an incorrect ITA determination
pursuant to that act's section 751 by depriving the Court of Inter-
national Trade of the ability (i.e., jurisdiction) to ensure anti-
dumping duties in accordance with the correct margin for those
entries.  The court of appeals concluded that it would.  <u>See</u> 710
F.2d at 809-10 and, for example, <u>SKF USA Inc. v. United States</u>, 28
CIT ___, ___, 316 F.Supp.2d 1322, 1327 (2004).  But jurisdiction of
the court is not necessarily in jeopardy.  Indeed, as recited
above, paragraph 14, the plaintiffs claim to have filed timely
protests with Customs pursuant to 19 U.S.C. §1514 which, one could
assume, provide them with some current protective comfort.

        Be those protests as they are, this action encompasses
numerous entries that have yet to be liquidated, and which has been

Court No. 05-00444                                          Page 9

restrained, at least temporarily pending this preliminary opinion.

In seeking to extend this injunctive relief, plaintiffs' argument

with regard to irreparable harm is as follows:

> . . . If Customs executes those [ITA] instructions, this
> action will become moot, Commerce's instructions will be
> insulated from judicial review, and Arcelor will lose its
> day in court.  "Plainly, irreparable harm will occur
> . . . if Commerce's action is not subject to judicial
> review; and if plaintiff will be deprived of its right to
> contest antidumping duty assessments when the liquidation
> of entries currently held by Customs are liquidated."
> *Royal Business Machs., Inc. v. United States*, . . . 1
> C.I.T. 24, 25 . . . [1980].

> To be sure, Arcelor ha[s] pending protests before
> Customs.  But "Customs merely follows Commerce's instruc-
> tions" and "has a merely ministerial role in liquidating
> antidumping duties under 19 U.S.C. §1514(a)(5)."  *Mitsu-*
> *bishi Elecs. America, Inc. v. United States*, 44 F.3d 973,
> 977 (Fed.Cir. 1994).  Where, as here, "Commerce sent
> liquidation instructions to Customs, which then imposed
> antidumping duties as directed by Commerce as part of its
> ministerial functions," Commerce's liquidation instruc-
> tions would not be subject to protest and "[t]he court
> has no jurisdiction pursuant to [28 U.S.C.] § 1581(a) for
> it was Commerce's instructions, rather than an independ-
> ent decision by Customs, which determined the antidumping
> rate."  *J.S. Stone Inc. v. United States*, 297 F.Supp.2d
> 1333, 1338 (CIT 2003).

Plaintiffs' Memorandum, pp. 5-6.

If this position were well-settled, then plaintiffs'

formal protests could prove to be of no conclusive moment.  But

this court notes that all that was before the court in the cited

Royal Business Machines matter was purported immediate concern by

that plaintiff that the ITA might come to modify the scope of an

outstanding antidumping-duty order, ergo the court's conditional

language quoted above; and this court also notes that J.S. Stone,
Inc. v. United States, 27 CIT ___, ___ and 297 F.Supp.2d 1333, 1338
n. 6 (2003), aff'd, 111 Fed.Appx. 611 (Fed.Cir. 2004), itself cites
Xerox Corp. v. United States, 289 F.3d 792, 795 (Fed.Cir. 2002), as
holding that,

> when a plaintiff's goods are facially outside of the
> scope of an antidumping duty order, a scope determination
> by Commerce and participation in the antidumping review
> were unnecessary predicates to a challenge of Customs
> imposition of antidumping duties. The Federal Circuit
> explained that . . . "the . . . misapplication of the
> order by Customs was properly the subject of a protest"
> under 19 U.S.C. §1514(a)(2) and reviewable by the CIT
> under 28 U.S.C. §1581(a). . . . Thus, misapplication of
> an antidumping order or the erroneous imposition of
> antidumping duties by Customs may be protested and suit
> brought before the court pursuant to § 1581(a).[]

In fact, it was the undersigned's opinion in Xerox Corp. v. United
States, 24 CIT 1145, 118 F.Supp.2d 1353 (2000), to the opposite
effect that was reversed and remanded by the court of appeals.

    Accepting this appellate enlightenment makes it now
difficult to conclude that plaintiffs' procedural posture herein
amounts to unequivocal irreparable harm.

                              (2)

    As for whatever harm is actually at bar, this court can
conclude that it weighs more on the plaintiffs than on either the
defendant or the intervenor-defendants for the reasons so suc-
cinctly stated, to wit:

> . . . The government holds cash deposits.  If Arcelor
> does not succeed on its claims, interested parties are
> fully secured.

Court No. 05-00444                                          Page 11

Plaintiffs' Memorandum, p. 11.   Perhaps this is why experienced

counsel for the defendant and also for the intervenors have now

filed papers, consenting, at least for purposes of orderly pro-

ceeding, to entry of a preliminary injunction.   On behalf of the

government, they state their

> consent . . ., although we dispute that plaintiff *[sic]*
> has established a likelihood of success upon the merits
> of plaintiffs' claims.  Indeed, in our view, plaintiffs'
> claims are wholly without merit, and plaintiffs stand no
> chance of prevailing upon the merits.   However, a pre-
> liminary injunction will prevent the irreparable harm
> from liquidation of any entries that have not yet been
> liquidated.  See Zenith Radio Corp. v. United States, 710
> F.2d 806, 810 (Fed.Cir. 1983).

Defendant's Response to Motion for Preliminary Injunction, p. 1.

The other filing states that the

> intervenors believe that plaintiffs do not meet any of
> the requirements to receive a preliminary injunction.
> . . . [Also], it appears that granting a preliminary in-
> junction against liquidation of all of the listed entries
> may be inappropriate, because it appears that some or all
> of the entries for which plaintiffs seek to enjoin
> liquidation have already been deemed liquidated as a
> matter of law under 19 U.S.C. § 1504(d).  The request for
> an injunction is not timely made for any entries that
> have been liquidated as a matter of law.
>
> Despite these defects in plaintiffs' application,
> proposed intervenors conditionally consent to the
> granting of a preliminary injunction for purely practical
> reasons -- to allow the Government and the parties to
> fully research and brief these substantive issues, par-
> ticularly concerning the history and liquidation status
> of the subject entries.  . . .[4]

---

[4] Intervenor-Defendants' Response to Plaintiffs' Motion for
Preliminary Injunction, pp. 1-2 (emphasis in original).

(footnote continued)

(3)

However salutary the concerns for orderly proceeding (and even accommodation) are, all who engage in international trade with the United States, and in subsequent administrative and judicial review thereof, must adhere, to the best of their respective situations, to the dictates of the governing law and related rules of practice. While the court can subscribe to plaintiffs' argument that the public has a compelling interest in judicial review of administrative action[5], this subscription does not automatically favor them (or alleviate their perceived predicament[6]). That is, it is not clear from the record, such as it has been presented initially, that the public's interest compels entry now of a preliminary injunction in favor of the plaintiffs.

_____

The court notes in passing that both responses set forth lists of entries that respective counsel apparently consider at least arguably at issue. According to the defendant's,

> [o]n August 10, 2005, plaintiffs stated that they have no objection to our amendments to their original proposed preliminary injunction order.

Defendant's Response to Motion for Preliminary Injunction, p. 2.

[5] Plaintiffs' Memorandum, p. 11.

[6] Cf. id. at 4 n. 2:

> . . . [S]ince Arcelor cannot know until after liquidation whether its remedy lies on review of Customs' protest decision or Commerce's liquidation instructions, an injunction must be granted now to preserve this Court's jurisdiction and Arcelor's right to judicial review.

(4)

Whatever the harm and its precise balance between the various parties herein may be, this court and others have held that the severity of the injury the moving party will sustain without injunctive relief is in inverse proportion to the showing of likelihood of success on the merits. E.g., Wolverine Tube (Canada), Inc. v. United States, 23 CIT 76, 78, 36 F.Supp.2d 410, 413 (1999), citing Makita Corp. v. United States, 17 CIT 240, 250, 819 F.Supp. 1099, 1108 (1993); Ceramica Regiomontana, S.A. v. United States, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984); American Air Parcel Forwarding Co. v. United States, 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981).

The plaintiffs claim a "substantial likelihood of success" in challenging the ITA's liquidation instructions because "they are flatly inconsistent with the agency's long-standing practice and its subsequent determination in this proceeding".[7] Of course, the main issue at bar is whether that determination can be drawn into "this proceeding". As the complaint itself indicates, supra, that subsequent determination was rendered as a result of the ITA's fourth administrative review pursuant to section 751 of the Trade Agreements Act, 19 U.S.C. §1675, and not during the preceding three such reviews that covered the entries that are now subject to plaintiffs' attempt at resurrection -- in the aftermath

---

[7] Id. at 6 (initial capital letters and boldface print of all the words deleted).

(4)

Whatever the harm and its precise balance between the various parties herein may be, this court and others have held that the severity of the injury the moving party will sustain without injunctive relief is in inverse proportion to the showing of likelihood of success on the merits. E.g., Wolverine Tube (Canada), Inc. v. United States, 23 CIT 76, 78, 36 F.Supp.2d 410, 413 (1999), citing Makita Corp. v. United States, 17 CIT 240, 250, 819 F.Supp. 1099, 1108 (1993); Ceramica Regiomontana, S.A. v. United States, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984); American Air Parcel Forwarding Co. v. United States, 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981).

The plaintiffs claim a "substantial likelihood of success" in challenging the ITA's liquidation instructions because "they are flatly inconsistent with the agency's long-standing practice and its subsequent determination in this proceeding".[7] Of course, the main issue at bar is whether that determination can be drawn into "this proceeding". As the complaint itself indicates, supra, that subsequent determination was rendered as a result of the ITA's fourth administrative review pursuant to section 751 of the Trade Agreements Act, 19 U.S.C. §1675, and not during the preceding three such reviews that covered the entries that are now subject to plaintiffs' attempt at resurrection -- in the aftermath

---

[7] Id. at 6 (initial capital letters and boldface print of all the words deleted).

Court No. 05-00444                                    Page 14

of that fourth ITA review, which led the agency specifically to

determine that its decision apply only to SSPC entries on or after

May 1, 2002, *viz.*:

> In the context of the fourth review, Respondent sub-
> mitted information to the record showing that it had sold
> German SSPC to the United States.  For the final results
> of the fourth review of this antidumping duty order, we
> determined that SSPC hot-rolled in Germany and not
> further cold-rolled in Belgium was not subject to the
> antidumping duty order on SSPC from Belgium.  .  .  .  As
> such, our analysis of Respondent's sales of SSPC to the
> United States made during the POR for the fourth review
> did not include sales of German SSPC.  During the fourth
> administrative review, neither the Petitioners nor the
> Respondent raised this country of origin issue with re-
> spect  to any specific sales reviewed during prior
> administrative reviews of this order or the effect of the
> country of origin decision on unliquidated entries from
> prior closed reviews.  As articulated in Comment 1 above,
> consistent with the <u>Torrington Remand</u>, we find that 1)
> our position regarding the German merchandise is fully
> articulated and final, 2) we did not calculate antidump-
> ing  margins using German merchandise in the Fourth
> Administrative Review, and 3) the country of origin of
> merchandise hot-rolled in Germany was first raised in the
> Fourth Administrative Review.  Therefore, we recommend
> applying our country of origin determination to entries
> covered by the fourth review and future entries, <u>i.e.</u>,
> to entries made on or after May 1, 2002.[8]

And CBP was instructed accordingly.  <u>See</u> Plaintiffs' Memorandum,

Exhibit 2, para. 3 (July 1, 2005):

> Based on the evidence reviewed by Commerce in con-
> ducting the administrative review of entries made during

---

[8] <u>Id.</u>, Exhibit 6, p. 7 (July 1, 2005)(Memorandum re Customs
Instructions for the Final Results of the Fourth Administrative
Review of the Antidumping Duty Order on . . . SSPC[] from Bel-
gium)(citation to Comment 4 of the ITA Issues and Decision Mem-
orandum of the Fourth Administrative Review of the Antidumping
Duty Order on . . . SSPC[] from Belgium (Dec. 14, 2004), <u>ibid.</u>,
Exhibit 1, available at http://ia.ita.doc.gov/frn/summary/2004-
dec.htm, omitted).

> this period (05/01/02-04/30/03), the Department has
> determined that imports of SSPC hot rolled in Germany and
> not further cold rolled in Belgium are not subject to the
> antidumping duty order on SSPC from Belgium. Entries of
> this merchandise made on or after 05/01/02 should be
> liquidated without regard to antidumping duties.

Capitalization deleted. Compare id. with id., Exhibit 10 (June 23,

2005)(ITA draft liquidation instructions) and id., Exhibit 4, para.

5 (July 18, 2005)(antidumping-duty liquidation instructions for

period 11/4/98 to 4/30/00) and id. Exhibit 5, para. 7 (July 8,

2005)(countervailing-duty liquidation instructions for period

9/4/98 to 12/31/99).

        In support of their claim of "substantial likelihood of

success" on the merits, the plaintiffs challenge the agency's

position on two grounds, namely, (a) it is contrary to law, and

(b), because their entries have not been liquidated, administrative

finality does not prevent correction of the country of origin.

                                (a)

        Their complaint, as recited above, is that, for their

entries between September 4, 1998 and April 30, 2002, they "mis-

takenly" declared the country of origin to be Belgium rather than

Germany, whereupon they paid cash deposits of antidumping and

countervailing duties on their merchandise that entered the United

States during those four years as specified in the underlying

orders governing Belgium. Moreover, the plaintiffs claim that

> [n]either Arcelor nor Commerce caught the mistake during
> the first three administrative reviews of the antidumping
> and countervailing duty orders on SSPC from Belgium. The
> mistake was identified and corrected in the fourth admin-
> istrative review.

Plaintiffs' Memorandum, p. 2. Yet, they seem critical that the
"only pertinent 'evidence' in the [fourth] administrative record
. . . is evidence of the country in which the steel was hot
rolled." Id. at 8. Nonetheless, they refer to other ITA proceed-
ings involving steel wherein that alone was also the determinative
factor for country of origin. Finally, they cite Renesas Technol-
ogy America, Inc. v. United States, 27 CIT ____, Slip Op. 03-106
(Aug. 18, 2003), to the effect that "liquidation instructions that
treat identical merchandise differently are arbitrary and capri-
cious". Id. But that case, which contested an ITA instruction to
liquidate entries of an unreviewed reseller of such subject mer-
chandise at the cash deposit rate, has been summarily reversed on
appeal, Renesas Technology America, Inc. v. United States, Nos. 04-
1473,-1474, 2005 WL 1540159 (Fed.Cir. July 1, 2005), based upon the
opinion of the same date in Nissei Sangyo America, Ltd. v. United
States, Nos. 04-1469,-1492, 2005 WL 1540161, at *1 (Fed.Cir. July
1, 2005), wherein the court of appeals stated that,

> [b]ecause the arguments in favor of the appellee [im-
> ports] are foreclosed by the decisions in Consolidated
> Bearings Co. v. United States, 348 F.3d 997 (Fed.Cir.
> 2003) . . ., and Consolidated Bearings Co. v. United
> States, [412 F.3d 1266] (Fed.Cir. June 21, 2005) . . .,
> which collectively held that an unreviewed reseller is
> not statutorily entitled to the manufacturer's review
> rate and that Commerce in the past consistently liqui-

dated unreviewed entries from unrelated resellers at the
cash deposit rate, we <u>reverse</u> the decision of the Court
of International Trade.

Emphasis in original.

        If this then is the only court case the plaintiffs can
cite, it provides no obvious support for their thesis herein.

                              (b)

        As indicated above, the ITA provided the parties with
draft customs instructions.  <u>See</u> Plaintiffs' Memorandum, Exhibit
10.  And both sides responded.  <u>Compare</u> <u>id.</u>, Exhibit 8 <u>with</u> <u>id.</u>,
Exhibit 9.  The agency thereupon promulgated the instructions now
at issue.  <u>See</u> <u>generally</u> <u>id.</u>, Exhibit 6.  Among other things, it
referred to and relied on its Final Results of Redetermination on
Remand[9] that issued pursuant to the order of the court in <u>Torring-</u>
<u>ton Co. v. United States</u>, 23 CIT 452 (1999), that the ITA apply to
its

        *Final Scope Ruling - Antidumping Duty Order on Cylindri-
        cal Roller Bearings and Parts Thereof from Japan -
        Regarding a Certain Cylindrical Roller Bearing Produced
        by Koyo Seiko Co., Ltd., and Imported by Koyo Corporation
        of U.S.A.* (Aug. 10, 1998), an effective date in accord-
        ance with the Court's holding in *Timken Co. v. United
        States*, 21 CIT 889, 972 F.Supp. 702 (1997), *aff'd sub
        nom. Koyo Seiko Co., Ltd. v. United Sates*, 155 F.3d 574
        (Fed.Cir. 1998).

_____

        [9] The plaintiffs have reproduced a copy of this redetermina-
tion and appended it to their memorandum as exhibit 7.

Judicial affirmance of those final results in their entirety[10] led
to the agency's repetition of the following statement therein in
response to the [plaintiffs'] comments on its draft liquidation
instructions herein:

> In _Timken_, the Court held that unliquidated merchandise
> which entered the customs territory of the United States
> after the publication of the antidumping duty order, but
> before the issuance of the scope ruling, should be li-
> quidated in accordance with the antidumping duty order.
> The CIT, however, stated that its holding was not
> intended to disturb the principles of administrative
> finality, i.e., require the re-opening or re-review of
> closed proceedings.  Thus, while a scope determination
> once made is effective back to the publication of the an-
> tidumping duty order, the CIT's holding in _Timken_ re-
> quires the Department to apply the scope determination
> only as far back as the principle of administrative
> finality warrants - back to _unliquidated entries of sub-_
> _ject merchandise covered by any administrative review_
> _period open at the time the scope issue was first raised,_
> _and to all unliquidated entries on in-scope merchandise_
> _after that period._[11]

The plaintiffs attempt to undermine this reasoning by
referring to the underlying _Timken_ litigation cited above, but, on
its face, _Torrington_ stands as further refinement of the import of
subsequent rulings as to the precise scope of an antidumping or
countervailing-duty order.  Whereupon the plaintiffs add that,

> even if this Court were to adopt Commerce's _Torrington_
> redetermination, it would only limit the _inclusion_ of
> "_subject merchandise_ covered by any administrative review
> period open at the time the scope issue was first
> raised."  . . . It does not by its terms prevent _exclu-_
> _sion_ of _non-subject merchandise_ - such as German merchan-

---

[10] See _Torrington Co. v. United States_, 24 CIT 306 (2000).

[11] Plaintiffs' Memorandum, Exhibit 6, p. 4 (emphasis added and
citations omitted by ITA herein).

> dise from orders covering Belgian merchandise. Since
> non-subject merchandise was (by definition) never subject
> to the antidumping and countervailing duty orders, en-
> tries of such merchandise cannot be liquidated as subject
> merchandise. Any instructions to do so would be contrary
> to law. As a result, Arcelor has a substantial likeli-
> hood of succeeding in its claim that Commerce has no
> legal authority to instruct Customs to liquidate German
> SSPC as Belgian merchandise.

Plaintiffs' Memorandum, p. 10 (emphasis in original; citation omitted).

This court cannot concur.

### III

In sum, the court cannot and therefore does not conclude that plaintiffs' instant application satisfies all of the standards for grant of the extraordinary interim equitable relief that is a preliminary injunction. Before entry of an order to this effect, however, the plaintiffs may inform the court and opposing counsel on or before August 24, 2005[12], as to how they propose to proceed from now on in this matter.

So ordered.

Dated:  New York, New York
        August 17, 2005

Senior Judge

---

[12] The court's temporary restraining order is hereby extended to the close of business on that day.

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated by the Attorney-In-Charge in a writing filed with the clerk of the court.

Leo M. Gordon
Clerk of the Court

Date: _8/17/05_

By: _Geoffrey Hall_
Deputy Clerk

Add. 20

Slip Op. 05 - 113

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - x
UGINE & ALZ BELGIUM, N.V.; ARCELOR
STAINLESS USA, LLC; and ARCELOR TRAD- :
ING USA, LLC,
                                     :
                    Plaintiffs,
                                     :
            v.                              Court No. 05-00444
                                     :
UNITED STATES,
                                     :
                    Defendant.
- - - - - - - - - - - - - - - - - x

Memorandum & Order

[Plaintiffs' renewed motion to enjoin
Department of Commerce liquidation in-
structions to Bureau of Customs denied.]

Dated: August 29, 2005

Shearman & Sterling LLP (Robert S. LaRussa, Stephen J. Marzen
and Ryan A.T. Trapani) for the plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen,
Director, and Patricia M. McCarthy, Assistant Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice
(Michael D. Panzera); and Office of Chief Counsel for Import Ad-
ministration, U.S. Department of Commerce (Ada Loo and Arthur
Sidney) and Bureau of Customs and Border Protection, U.S. Depart-
ment of Homeland Security (Christopher Chen), of counsel, for the
defendant.

AQUILINO, Senior Judge:  The court was constrained to

conclude in slip opinion 05-97, 29 CIT ___, ___ F.Supp.2d ___ (Aug.

17, 2005), familiarity with which is presumed, that it could not

grant plaintiffs' application for a preliminary injunction in this

action, enjoining certain liquidation instructions that have been

issued to the Bureau of Customs and Border Protection, U.S.

Department of Homeland Security by the International Trade Admin-

istration, U.S. Department of Commerce[1] in conjunction with its
Notice of Amended Final Determinations: Stainless Steel Plate in
Coils from Belgium and South Africa; and Notice of Countervailing
Duty Orders: Stainless Steel Plate in Coils from Belgium, Italy and
South Africa, 64 Fed.Reg. 25,288 (May 11, 1999), and its Antidump-
ing Duty Orders; Certain Stainless Steel Plate in Coils From
Belgium, Canada, Italy, the Republic of Korea, South Africa, and
Taiwan, 64 Fed.Reg. 27,756 (May 21, 1999). That slip opinion, page
19, afforded the plaintiffs an opportunity before entry of an order
denying that injunctive relief to "inform the court and opposing
counsel . . . as to how they propose to proceed from now on in this
matter" and continued in effect the temporary restraining order
entered on July 27, 2005 until the close of business on August 24,
2005.

I

        The plaintiffs have responded by filing the following
papers: Motion for Clarification and Reconsideration; Memorandum in
Support of Plaintiffs' Motion for Clarification and Reconsideration
or, in the Alternative, for an Injunction Pending Appeal[2]; Order of
Reconsideration[3]; and Renewed Temporary Restraining Order[4]. Obvi-

---

[1] Referred to hereinafter as "ITA".

[2] Referred to hereinafter as "Plaintiffs' Memorandum".

[3] As submitted, this proposed form of order would vacate slip
opinion 05-97.

[4] The plaintiffs have also filed an Additional Statement of
Defendant Consenting to Extension of the Temporary Restraining

(footnote continued)

Court No. 05-00444                                    Page 3

ously, these amount to a plea for a return to the beginning --
rather than any procedure for expedited joinder of issue and trial
of this action for equitable relief on the merits.

A

The gravamen of that relief for which the plaintiffs
pray, whether preliminary or permanent, is essentially the same.
Compare Plaintiffs' Complaint, para. 29(a) with Plaintiffs' [Pro-
posed] Preliminary Injunction, 2nd decretal para. (filed July 22,
2005). But a preliminary injunction is extraordinary relief, while

---

Order and Injunction Pending Appeal wherein they represent that
counsel for the defendant responded by e-mail to these filings,
giving the consent indicated, albeit conditioned upon the report-
ed caveat that

the Government strongly agrees with the Court's denial of
plaintiffs' request for a preliminary injunction, and
urges plaintiffs to withdraw their meritless complaint[.]

Subsequent to this filing, the court received defendant's Partial
Consent Motion for Extension of Time, which affirmed plaintiffs'
foregoing representations as well as their consent to that motion
of the defendant,

conditioned upon the temporary restraining order re-
maining in place for the duration of the Court's consid-
eration and disposition of the motion for reconsider-
ation.

The plaintiffs further represent that counsel for the in-
tervenor-defendants did not have any position on the requested
extension of the temporary restraining order. See Plaintiffs'
Memorandum, p. 5 n. 1.

"However salutary the concerns for orderly proceeding (and
even accommodation) are" [Slip Op. 05-97, p. 12], the effect of
that restraining order is the same as that of the requested pre-
liminary injunction, which, as discussed in slip opinion 05-97 and
again hereinabove, cannot be granted. Hence, that order of July
27, 2005, must be, and it hereby is, vacated (as of the close of
business on August 24, 2005).

a permanent injunction is not -- because, by the moment of the
latter's entry, a full and complete record of all the underlying
facts and circumstances has been developed and adjudicated. Ergo,
the standards the courts have set for grant of the former (in the
absence of such a record) are strict -- and have not been satisfied
by the plaintiffs herein. There is no evidence yet on the record
to explain, for example, how the first-named, Belgian plaintiff
herein could have for years (1) processed (or had processed)
["pickled and annealed"[5]] the subject merchandise in Belgium; (2)
packaged and shipped that product from that land to this country;
(3) certified those goods upon entry via its affiliated corporate
U.S. agents, the Arcelor plaintiffs, as products of Belgium subject
to the above-cited ITA countervailing- and antidumping-duty orders;
(4) advanced without protest all of the duties contemplated by
those orders covering Belgium; (5) not challenged Belgium as the
country of origin during successive ITA administrative (or possible
court) reviews of those entries; and (6) still now plead after
myriad such entries that those deeds were all the result of
"mistake"[6], one counsel now contend is actionable as a matter of
U.S. law because the merchandise is not really from or of Belgium.

        There is no evidence yet on the record to determine
whether or not the entries allegedly encompassed by this action
are, as the intervenor-defendants posit, deemed liquidated as a

---

[5] Plaintiffs' Complaint, paras. 1-3.

[6] See id., paras. 10, 14, 15.

matter of law -- and therefore now beyond the reach of any belated

claim for equitable relief.  See Slip Op. 05-97, p. 11, quoting

from Intervenor-Defendants' Response to Plaintiffs' Motion for

Preliminary Injunction, pp. 1-2.  Indeed, this stance of the

petitioners-cum-intervenor-defendants had been taken first before

the ITA[7], citing for support the recent decision in Int'l Trading

Co. v. United States, 412 F.3d 1303 (Fed.Cir. 2005), to the effect

that any entry that is not liquidated within six months after

notice of removal of the suspension of liquidation is deemed

liquidated by operation of law at the rate the product was entered.

The plaintiffs have yet to offer any response with regard to this

potentially-dispositive issue, not on the facts, not on the law,

not in their instant motion for reconsideration.

    Their motion does seek clarification of the court's

jurisdiction.  It states that, if this court

> determines that it has jurisdiction over the subject
> matter of this action and can therefore reach the merits
> of Arcelor's preliminary injunction motion, then Arcelor
> respectfully moves the Court to reconsider whether [it]
> has established a substantial likelihood of success on
> the merits.[8]

But it is not imperative that this court conclusively determine

---

[7] See Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Exhibit 9, pp. 6-7.

[8] Plaintiffs' Memorandum, p. 3.  They also express the view that, whether or not they would suffer irreparable harm from denial of the preliminary injunction determines if the court must dismiss this action for lack of subject-matter jurisdiction or may reach the merits of their application for that injunction.  See id. at 2-3.

jurisdiction over an action as a predicate to ruling on the merits

of such threshold equitable relief.  In <u>U.S. Ass'n of Importers of</u>

<u>Textiles & Apparel v. United States</u>, 413 F.3d 1344, 1348 (Fed.Cir.

2005), reversing a Court of International Trade grant of a

preliminary injunction, for example, the court of appeals neverthe-

less found "no abuse of discretion in the trial court's decision to

delay consideration of the government's motion to dismiss [for lack

of subject-matter jurisdiction] until briefing was completed." On

the other hand, the Federal Circuit

> disagree[d] . . . that the jurisdictional arguments could
> be [completely] ignored in ruling on the Association's
> preliminary injunction motion. The question of jurisdic-
> tion closely affects the Association's likelihood of
> success on its motion for a preliminary injunction.
> Failing to consider it was legal error.

Suffice it simply to repeat now that this court has indeed con-

sidered plaintiffs' claim of jurisdiction, including its reliance

on <u>Zenith Radio Corp. v. United States</u>, 710 F.2d 806 (Fed.Cir.

1983)[9], but that it does not enhance their application for a

preliminary injunction.

                                   B

        Plaintiffs' instant motion for reconsideration is stated

as made pursuant to USCIT Rules 59 (New Trials; Rehearings;

Amendment of Judgments) and 62(c) (Injunction Pending Appeal). With

regard to the first rule, this court recently pointed out, yet

_____

[9] <u>Compare</u> Memorandum in Support of Plaintiffs' Motion for
Temporary Restraining Order and Preliminary Injunction, p. 5
<u>with</u> Slip Op. 05-97, p. 8. <u>Cf.</u> Plaintiffs' Memorandum, p. 5.

Court No. 05-00444                                    Page 7

again, [Agro Dutch Industries Ltd. v. United States, 29 CIT ____,

Slip Op. 05-28, pp. 5-6 (Feb. 28, 2005), appeal docketed, No. 05-

1288 (Fed.Cir. March 22, 2005)] that it considers a motion for

reconsideration to be "a means to correct a miscarriage of

justice". Starkey Laboratories, Inc. v. United States, 24 CIT 504,

510, 110 F.Supp.2d 945, 950 (2000), quoting Nat'l Corn Growers

Ass'n v. Baker, 9 CIT 571, 585, 623 F.Supp. 1262, 1274 (1985).

Compare Bomont Industries v. United States, 13 CIT 708, 711, 720

F.Supp. 186, 188 (1989) ("a rehearing is a 'method of rectifying a

significant flaw in the conduct o[f] the original proceeding'"),

quoting RSI (India) Pvt., Ltd. v. United States, 12 CIT 594, 595,

688 F.Supp. 646, 647 (1988), quoting the "exceptional circumstances

for granting a motion for rehearing" set forth in North American

Foreign Trading Corp. v. United States, 9 CIT 80, 607 F.Supp. 1471

(1985), aff'd, 783 F.2d 1031 (Fed.Cir. 1986), and in W.J. Byrnes &

Co. v. United States, 68 Cust.Ct. 358, C.R.D. 72-5 (1972).    Cf.

USCIT Rule 61:

> No error . . . or defect in any ruling or order or
> in anything done or omitted by the court or by any of the
> parties is ground for granting a new trial or for setting
> aside a verdict or for vacating, modifying, or otherwise
> disturbing a judgment or order, unless refusal to take
> such action appears to the court inconsistent with
> substantial justice.  The court at every stage of the
> proceeding must disregard any error or defect in the
> proceeding which does not affect the substantial rights
> of the parties.

Or, stated another way, the

> purpose of a petition for rehearing [] under the Rules
> . . . is to direct the Court's attention to some material
> matter of law or fact which it has overlooked in deciding

Court No. 05-00444                                          Page 8

> a case, and which, had it been given consideration, would
> probably have brought about a different result.

NLRB v. Brown & Root, Inc., 206 F.2d 73, 74 (8th Cir. 1953). See
also Exxon Chemical Patents, Inc. v. Lubrizol Corp., 137 F.3d 1475,
1479 (Fed.Cir.), cert. denied, 525 U.S. 877 (1998); New York v.
Sokol, No. 94 Civ. 7392 (HB), 1996 WL 428381, at *4 (S.D.N.Y. July
31, 1996), aff'd sub nom. In re Sokol, 108 F.3d 1370 (2d Cir.
1997); In re Anderson, 308 B.R. 25, 27 (8th Cir. BAP 2004).

Plaintiffs' motion at bar fails to show any miscarriage
of justice. It does correctly state, on the other hand, that "the
standard for granting a preliminary injunction is the same as the
standard for granting an injunction pending appeal". Plaintiffs'
Memorandum, p. 5. But this, of course, means that, since the
plaintiffs have failed to carry their burden of persuasion for
grant of a preliminary injunction in this action in the Court of
International Trade, they also are not entitled to that kind of
extraordinary relief pending appeal to another court on the very
same grounds.

II

The plaintiffs make clear their intent to attempt to
proceed in the absence of expedited joinder of issue and trial of
this action on the merits. And since this court is unable to con-
tinue in effect the extraordinary relief that was the temporary
restraining order or to grant a preliminary injunction either
herein or pending appeal, this memorandum, which incorporates by

Court No. 05-00444                                          Page 9

reference the court's slip opinion 05-97, shall serve as the order

denying that relief, as prayed for initially, and via plaintiffs'

instant motion for clarification and reconsideration or, in the

alternative, for an injunction pending appeal.

       So ordered.

Dated:  New York, New York
       August 29, 2005

                                       _Thomas J. Aquilino, Jr._
                                            Senior Judge

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 31st day of October, 2005, two (2) bound copies

of the foregoing Brief of Appellants was served via United States First Class Mail,

postage prepaid, addressed to the following:

| | |
|---|---|
| Alan R. Luberda | Michael D. Panzera |
| COLLIER, SHANNON, SCOTT, PLLC | DEPARTMENT OF JUSTICE |
| 3050 K Street, NW | 1100 L Street, NW |
| Suite 400 | Room 10122 |
| Washington, DC  20007-5108 | Washington, DC  20530 |

*Counsel for Appellees*
*AFL-CIO/CLC,*
*Alleghany Ludlum,*
*United Steel Workers of America,*
*Zanesville ARMCO Independent Organization,*
*and AK Steel Corp.*

*Counsel for Appellee*
*United States*

I also certify that on the 31st day of October, 2005, the required number of

said Brief was hand filed at the Office of the Clerk, United States Court of Appeals

for the Federal Circuit.

The necessary filing and service to Counsel were performed in accordance

with the instructions given me by counsel in this case.

Justin March
The Lex Group$^{DC}$
1750 K Street, NW
Suite 475
Washington, DC  20006
(202) 955-0001

Filed and Served on Behalf of:

Stephen J. Marzen
Robert S. LaRussa
Wendy E. Ackerman
Jonathan R. DeFosse
Ryan A. T. Trapani*
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20004-2604
(202) 508-8000
(202) 508-8100 (fax)

*Counsel for Ugine & ALZ Belgium,*
  *Arcelor Stainless USA LLC,*
  *and Arcelor Trading USA, LLC*

Dated: October 31, 2005

*Attorneys for Plaintiffs-Appellants*

---

\* Admitted only in the State of New York, supervised by the partners of Shearman
& Sterling LLP.

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,230 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), as counted by the word count function of the word-processing system used to prepare the brief.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Jonathan R. DeFosse
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20004-2634
(202) 508-8000
Counsel for Ugine & ALZ Belgium;
Arcelor Stainless USA LLC; and Arcelor
Trading USA, LLC

Dated: October 31, 2005